[Cite as *State v. Gutierrez*, 2011-Ohio-3126.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## HANCOCK COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                 CASE NO. 5-10-14

    v.

RONNIE GUTIERREZ,                    O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Hancock County Common Pleas Court
Trial Court No. 2008 CR 310

Judgment Affirmed in Part, Reversed in Part and Cause Remanded

Date of Decision: June 27, 2011

APPEARANCES:

    *Keith O'Korn* for Appellant

    *Mark C. Miller and Drew A. Wortman* for Appellee

**WILLAMOWSKI, J**.

{¶1} Defendant-Appellant, Ronnie Gutierrez ("Gutierrez"), appeals the judgment of the Hancock County Court of Common Pleas finding him guilty of six counts of rape of his young step-daughter and sentencing him to life in prison without parole. Gutierrez contends that the trial court made numerous errors violating his constitutional and due process rights; that he was denied his right to an impartial jury; that the convictions were not supported by sufficient evidence and were against the manifest weight of the evidence; that he was denied effective assistance of counsel; and that the sentencing entry failed to impose the correct term of postrelease control. For the reasons set forth below, the judgment is affirmed in part and reversed in part.

{¶2} Gutierrez and Kelley Snyder (f.k.a. Kelley Gutierrez; hereinafter "Ms. Snyder" or "Mother") were married in December of 2005. Ms. Snyder's daughter, A.P. was just turning five years old at the time. A.P. seldom saw her biological father,[1] and she called Gutierrez "daddy."

{¶3} During the 2006-2007 school year when A.P. was in kindergarten, A.P. began to exhibit behavioral problems and was not getting along with other children in school. Beginning in May of 2007, Ms. Snyder took A.P. to the

---

[1] Ms. Snyder was never married to A.P.'s biological father. Her biological father was not a part of A.P.'s life when Ms. Snyder was married to Gutierrez, and A.P. only had sporadic visitation with him at this time.

Family Resource Center ("FRC") for therapy sessions and A.P. began to meet regularly with Ms. Connie Sue Crego-Stahl ("Therapist" or "Ms. Crego-Stahl") at the FRC.

{¶4} One weekend in July of 2008, A.P., her Mother, and Gutierrez went on a family trip to The Wilds, a wild animal preserve in southeastern Ohio. Upon returning from the trip on the evening of July 13th, Gutierrez put A.P. to bed as he often did. The next morning while Ms. Snyder was getting ready, A.P. came into the bathroom and disclosed to her Mother that, "when daddy lays me down for bed * * * sometimes he rubs my stomach for a little while then he makes me suck his P.P." Ms. Snyder was shocked and upset. After confronting Gutierrez, she packed up their things and left with A.P. She later divorced Gutierrez.

{¶5} Ms. Snyder took A.P. to the Therapist for an emergency appointment that same day. A.P. told Ms. Crego-Stahl what she had told her Mother. The allegations were also reported to the police and the Hancock County Job and Family Services, Children's Protective Services Unit ("CPSU"). Ms. Crego-Stahl continued to meet with A.P. regularly to help her deal with the trauma of the abuse, and A.P. eventually shared that Gutierrez had also put his finger in her vagina and had anal sex with her.

{¶6} Brianna Westrick ("Ms. Westrick"), an investigator with the CPSU, and Detective Matthew Tuttle ("Detective Tuttle"), with the Findlay Police

Department, investigated the matter and conducted a video-recorded forensic interview with A.P. on July 24, 2008. During the interview, A.P. was animated and happy when discussing her mother, her pets, and other activities. However, she became sullen, quiet, and looked down when she was asked what she liked about Gutierrez. She answered, "nothing," and then she disclosed the sexual abuse and physically demonstrated how Gutierrez would push her head up and down to force her to perform oral sex. A.P. stated that it had been happening all the time since she was in kindergarten, and she was now in second grade.

{¶7} On December 30, 2008, the Hancock County Grand Jury indicted Gutierrez of six counts of rape pursuant to R.C. 2907.02(A)(1)(b), all felonies of the first degree. The first three counts alleged that Gutierrez raped his step-daughter, who was under ten years old, between September 5, 2006 and June 8, 2007, by making her perform fellatio on him (count one), by digitally penetrating AP's vagina (count two), and by sodomizing her (count three). Counts four, five and six alleged the same conduct for each of the respective counts, but "on or about" the date of July 13, 2008.

{¶8} There were numerous pre-trial motions and hearings. The defense challenged A.P.'s competency to testify. The trial court held an in camera hearing, interviewed A.P., and found A.P. competent to testify. Gutierrez also sought records from the FRC, the CPSU, and A.P.'s grand jury testimony. The

trial court reviewed the records and the grand jury testimony under seal and found no inconsistencies or anything exculpatory to disclose; it denied Gutierrez' motions.

{¶9} The defense also sought to exclude testimony from other witnesses about statements made to them by A.P. and to exclude the playing of the forensic video at trial. The trial court found the statements and video were admissible.

{¶10} In March of 2010, the case proceeded to trial. During the two-day trial, the jury heard testimony from Ms. Snyder, Detective Tuttle, Ms. Westrick, Ms. Crego-Stahl, and A.P., who was nine-years old at the time. When A.P. testified, she was very uncomfortable about saying what had happened out loud, so she wrote on a piece of paper: "he made me suck on his P.P. and put his P.P. in my butt and his finger in my P.P." A.P.'s written testimony was placed on the ELMO for the entire court to see and both parties questioned her about her written statement.

{¶11} The jury returned guilty verdicts on all six counts of rape. On March 18, 2010, Gutierrez was sentenced to an aggregate prison term of life without parole.[2] Gutierrez now appeals, raising the following eight assignments of error.

---

[2] The trial court sentenced Gutierrez to life in prison for the first three counts in the indictment, which was the applicable punishment for those offenses according to the statutes in effect during that time period. The sentence for the remaining three counts was life in prison with no possibility of parole.

## First Assignment of Error

**The court violated Evid.R. 601 and denied Appellant his rights to due process of law and a fair trial guaranteed by the 5th and 14th Amendments to the U.S. Constitution, and Article I, Section 10 of the Ohio Constitution when the court found the child witness competent to testify.**

## Second Assignment of Error

**The court violated the *Brady* rule and the Due Process and Confrontation Clauses of the U.S. and Ohio Constitutions by failing to order the State to disclose *Brady* material in the sealed records pertaining to the alleged victim's sex abuse claims and her grand jury testimony.**

## Third Assignment of Error

**The court violated Appellant's right to present a defense and due process by not providing his consulting expert on tainted child-statements in sex offense cases with the sealed records and grand jury testimony relating to the questioning of the alleged victim.**

## Fourth Assignment of Error

**The court violated Ohio's hearsay rules and state and federal due process and confrontation principles when it admitted statements made by the alleged victim to many third parties.**

## Fifth Assignment of Error

**Appellant was prejudiced by the court's failure to excuse one of the jurors for cause, and the composition of the jury violated Appellant's right to an impartial jury under the 6th and 14th Amendments to the U.S. constitution.**

**Sixth Assignment of Error**

**Appellant's convictions were not supported by sufficient evidence in violation of the Due Process Clause of the 14th Amendments to the U.S. Constitution, and Article I, Sections 1 & 16 of the Ohio Constitution and the convictions were also against the manifest weight of the evidence.**

**Seventh Assignment of Error**

**The sentence is contrary to law.**

**Eighth Assignment of Error**

**Trial counsel rendered ineffective assistance of counsel in violation of the 6th Amendment to the U.S. Constitution, and Article I, Sections 10 and 16 of the Ohio Constitution.**

*First Assignment of Error*

{¶12} In the first assignment of error, Gutierrez maintains that the trial court erred when it found that A.P. was competent to testify at trial. A.P. was between six and seven years old when the alleged abuse occurred, eight years old at the time of the competency hearing, and nine years old at trial. Although the trial court conducted a competency hearing, Gutierrez claims that A.P. was unable to satisfactorily answer many of the questions that were asked and that she was unable to establish her ability to recall events from the relevant time period. Gutierrez further contends that A.P. showed little ability to receive impressions or recall or communicate what she observed, particularly in the interval of one-to-three years prior to the hearing. And finally, Gutierrez asserts that the trial court

failed to take into consideration A.P.'s "history of fabrication" and the fact that she was being treated at FRC for "lying."

{¶13} Evid.R. 601(A) provides that every person is competent to testify except children under ten years old "who appear incapable of receiving just impressions of the facts and transactions respecting which they are examined, or of relating them truly." In determining whether a child under ten is competent to testify, the trial court must take into consideration whether the child is able to (1) receive accurate impressions of fact or to observe acts about which the child will testify, (2) recall those impressions or observations, (3) communicate what was observed, (4) understand truth and falsity, and, (5) appreciate the responsibility to be truthful. *State v. Frazier* (1991), 61 Ohio St.3d 247, 251, 574 N.E.2d 483. Because the trial court has the opportunity to observe the child's appearance, manner of responding to questions, general demeanor and ability to relate facts accurately and truthfully, its determination will not be reversed absent an abuse of discretion. *State v. McNeill*, 83 Ohio St.3d 438, 442, 1998-Ohio-293, 700 N.E.2d 596.

{¶14} A competency hearing was held on June 9, 2009, and the trial court questioned A.P. on various topics, including her age, her family, her residence, schooling, television shows, weather, how many fingers the judge was holding up, and the importance of telling the truth. The judge also tried to "trick" A.P. to see

if she would change her answers and say something false, but she did not. After she distinguished between when the judge was telling the truth and telling a lie, the trial court further questioned her as follows:

**Q. Is it okay to tell a lie?**

**A. No.**

**Q. How do you know that?**

**A. Because if you tell a lie people don't know for – if you lie then they don't know how – when you're telling the truth or not. Because if you always lie they don't know if you're telling a truth or lie.**

**Q. You understand you could get in trouble if you tell a lie?**

**A. Yes.**

**Q. Especially if you're in that chair?**

**A. Yes.**

(June 9, 2009 Hearing Tr., p. 23.)

{¶15} After this interview with A.P., the trial court had no problem in finding A.P. competent to testify at trial, stating on the record:

**[A.P.] knows today's weather, her age, her birthday. She knows where she lives. She knows what grade she was in last year. She knows what grade she's going to be in next year. She can't remember her [last year's] teacher's name. She knows the name of her family members, dad, stepdad, mom, and siblings. She has a favorite T.V. show * * *.**

**I think she understands. I'm convinced she understands the concept of telling the truth and telling a lie. * * * She appeared very composed here in the courtroom. So those are my findings from my observations here in the courtroom. She understands to tell the truth. She understands that she can get in trouble if she tells a lie.**

(Id., 28-29.)

{¶16} The trial court did a thorough inquiry to determine whether A.P. was competent to testify. There is no requirement that a child witness must correctly answer *every* question that is asked. See *State v. McNeill*, 83 Ohio St.3d at 443, 700 N.E.2d 596 (upholding a trial court's determination that two children were competent to testify even though they were unable to answer every question asked.)

{¶17} Throughout the trial process and continuing with this appeal, Gutierrez has attempted to label A.P. as someone who has a serious problem with lying. The record does not support this allegation. Gutierrez reiterates a very few instances where A.P. did not tell the truth and tries to extrapolate those incidents into an assumption that she is a chronic liar and not to be believed.

{¶18} One situation involved a 2007 investigation resulting from what was apparently an accidental cigarette burn on AP's thumb. It appears that there was some misunderstanding and multiple versions as to what happened. But, the trial court found that the CPSU records showed that the statements saying A.P. was a

"habitual liar" came from Gutierrez himself, and not from the agency's findings. (June 9, 2009 Hearing Tr., p. 6.) And, contrary to Gutierrez's assertions that A.P. "was being treated at the FRC for lying," the record shows that she was *primarily* being treated for acting out and behavioral issues which began during her kindergarten year, shortly after Gutierrez came into her life. AP's Therapist testified that she did not feel that A.P. had ever lied to her. (Trial Tr., p. 523.)

{¶19} There was also an incident where A.P. purposely scratched a neighbor's classic car with a rock or other sharp object and then denied doing it. Although she initially lied about this, A.P. came forward a few days later and confessed after she learned that another boy was going to be in trouble for it. (Trial Tr., p. 327.) It is not unusual for children to sometimes lie to avoid getting into trouble. Instead of this incident demonstrating that A.P. is a "liar," as Gutierrez would want us to believe, it would appear that her actions indicated that she does know the difference between telling the truth and lying, the consequences that can result from lying, and the importance of coming forward and telling the truth. The standard for determining a child's competency to testify does not require that the child has *never* told a lie; it only requires that the child understand the difference between truth and falsity, and appreciate the responsibility to be truthful. See *Frazier*, supra.

**{¶20}** The trial court was able to personally observe A.P. and interact with her. The court's line of questioning elicited responses from A.P. that showed her ability to understand and tell the truth, accurately receive information, and communicate observations. We cannot conclude that the trial court abused its discretion when it found that A.P. was competent to testify. The first assignment of error is overruled.

*Second Assignment of Error*

**{¶21}** Gutierrez asked the trial court to order the disclosure of records relating to AP's sexual abuse allegations from the FRC and CPSU, and also AP's grand jury testimony. The trial court reviewed the sealed records in camera but did not order their disclosure because it found that they did not contain any inconsistencies or exculpatory evidence. Gutierrez claims that the denial of this information amounted to a denial of due process and infringement of the right to confrontation.

**{¶22}** Pursuant to Crim.R. 16(B)(1)(f), a criminal defendant is entitled to discovery of any evidence that is "favorable to the defendant and material to either guilt or punishment." The granting or overruling of discovery motions in a criminal case rests within the sound discretion of the trial court. *State v. Craft*, 149 Ohio App.3d 176, 178, 2002-Ohio-4481, 776 N.E.2d 546, 548, ¶10. Abuse of discretion connotes more than an error of judgment; it implies that the trial court's

decision was arbitrary, unreasonable, or unconscionable. *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 404 N.E.2d 144

{¶23} In the present case, Gutierrez sought discovery and review of confidential records kept by the FRC and CPSU, in addition to A.P.'s grand jury testimony. However, departments of human services and children's services boards are required to keep records and reports of alleged child-abuse or neglect confidential. *Johnson v. Johnson* (1999), 134 Ohio App.3d 579, 583, 731 N.E.2d 1144, citing R.C. 2151.99. The records of A.P.'s counseling sessions with her therapist are privileged. And typically, grand jury proceedings are secret and an accused is not entitled to inspect grand jury transcripts unless the ends of justice require it and there is a showing by the defense that a particularized need for disclosure exists which outweighs the need for secrecy. *State v. Fry*, 125 Ohio St.3d 163, 173, 2010-Ohio-1017, 926 N.E.2d 1239, 1256, ¶66.

{¶24} The United States Supreme Court has acknowledged that under certain circumstances in the criminal context, records of the children's services agency must be made available to the trial court for an in camera inspection. *Johnson*, 134 Ohio App.3d at 584. In *Pennsylvania v. Ritchie* (1987), 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40, the United States Supreme Court held that a criminal defendant's right to a fair trial entitles the defendant to an in camera review by the trial court of the confidential records in order to determine whether

the records contain evidence material to the accused's defense. Accordingly, "a court may conduct an in camera inspection of child-abuse records or reports and also has the inherent power to order disclosure of such records or reports where (1) the records or reports are relevant to the pending action, (2) good cause for such a request has been established by the person seeking disclosure, and (3) where admission of the records or reports outweighs the confidentiality considerations set forth in R.C. 5153.17 and R.C. 2151.421(H)(1). *Johnson,* supra at 585.

{¶25} The trial court conducted an in camera review of all the records requested by Gutierrez and was prepared to allow Gutierrez access to any exculpatory evidence or inconsistencies in the records. However, after the review, the trial court summarized the contents of the records and reported that they did not contain any exculpatory evidence or inconsistencies.

{¶26} Gutierrez now claims that the trial court violated the *Brady* rule and the Due Process and Confrontation Clauses of the U.S. and Ohio Constitutions by failing to order the State to disclose all exculpatory and impeachment evidence. The *Brady* doctrine requires the prosecution to disclose all exculpatory material to a defendant. See *Brady v. Maryland* (1963), 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215. See also *Giglio v. U.S.* (1972), 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (requirement to disclose impeachment evidence.)

{¶27} The defense claims it wished to examine the records to establish the source of the alleged "inconsistency" between A.P.'s first disclosures of only fellatio and her later claims, which led to additional counts in the indictment for vaginal penetration and sodomy. Testimony at trial explained that it was not unusual for a child to make a limited disclosure at first, and then to reveal more as time goes by and the child gains greater trust. However, the records in this case do not provide information concerning the details of the disclosure of the additional types of abuse beyond what was related to Gutierrez in the indictment and the bill of particulars.

{¶28} The trial court examined A.P.'s grand jury testimony, which had been filed under seal. The trial court found, "there was no exculpatory evidence at all, and there was only one rendition of the facts. There was no variance. * * * It was all one rendition of the facts as they are claimed to have taken place." (June 9, 2009, Tr. 4.) A.P. was asked what had happened that made her not want to live with her stepdad anymore and A.P. wrote on an easel pad about the same three acts that she disclosed at the trial. The CSPU records, which also had been filed under seal, likewise did not contain any information concerning the additional allegations.

{¶29} The FRC's records, also filed under seal, consisted of brief summaries of the 55-57 individual and group counseling sessions that A.P.

attended over an eighteen-month time period. The reports from prior to A.P.'s disclosure of the abuse mostly noted the various play, art and other therapeutic activities that were done to help improve A.P.'s behavioral issues. After the reported abuse, there were three sessions, one each in July, August, and September, at which the Therapist provided support and helped A.P. deal with her feelings.

{¶30} At the November session, the Therapist wrote that "Client did disclose more abuse (wrote it as she did not want to say it aloud, see attached). Writer did process with client, i.e., not her fault, etc. Did start workbook of 'No More Hurt' as client willing to work at this point. * * *" The attached writing made by A.P. was "he put his fingers in my PP and he put his PP in my butt." The following sessions noted that they continued to work in the "No More Hurt" workbook, and the therapist wrote that she was working with A.P. to help her deal with her feelings and her dreams.

{¶31} This was the only place in the sealed records which discussed A.P.'s disclosure of the additional abuse. Although the trial court did not release these records to Gutierrez, the Therapist testified at an evidentiary hearing on July 7, 2009, pertaining to various motions before the court. The Therapist was questioned in detail about everything that occurred with A.P., and defense counsel cross-examined the Therapist extensively. At that time, the Therapist answered all

of the defense counsel's questions and thoroughly explained how A.P. came to disclose the additional abuse and all of the attendant circumstances. (See July 7, 2006 Tr., pp. 33-105.) Although Gutierrez did not have access to the actual FRC records, he had access to even more information than was contained in the brief counseling session summaries.

{¶32} Defense counsel asked the trial court to review the records to look for "exculpatory evidence" and "inconsistencies in any of the victim's statements." The trial court did so and did not find any exculpatory evidence or inconsistencies, other than A.P.'s eventual disclosure of the additional abuse. Gutierrez was already aware of A.P.'s disclosure of the additional abuse as a result of the information in the indictment, the bill of particulars, and the Therapist's testimony at the evidentiary hearing. The records did not provide any further information concerning this matter. See *State v. Donnal*, 3d Dist. No. 1-06-31, 2007-Ohio-1632 (finding no error when, after in camera inspection, trial court did not release confidential records that did not contain relevant evidence.)

{¶33} After conducting our own review of the records, we concur with the trial court's conclusion that there was no exculpatory or contradictory evidence to disclose that would have been beneficial to Gutierrez' defense. In determining whether evidence favorable to an accused was improperly suppressed, such evidence shall be deemed material "only if there is a reasonable probability that,

had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley* (1985), 473 U.S. 667, 682 105 S.Ct. 3375, 3383 87 L.Ed.2d 481; *State v. Johnston* (1988), 39 Ohio St.3d 48, 61, 529 N.E.2d 898, 911. In this case, trial court cannot be faulted for not disclosing any exculpatory evidence where none existed.

{¶34} And, as to Gutierrez' Confrontation Clause argument relative to the denial of access to pretrial discovery, the Ohio Supreme Court has stated that "[t]he Confrontation Clause *is not a pretrial discovery device*." (Emphasis added.) *State v. Wickline* (1990), 50 Ohio St.3d 114, 118, 552 N.E.2d 913, 918-919. A defendant cannot claim that he was denied the right to confront his accuser when he has had the opportunity to cross-examine his accuser at trial. Id.

{¶35} The trial court's in camera examination of the sealed records was in accordance with the law and revealed that they did not contain any exculpatory or impeachment evidence. Gutierrez' second assignment of error is overruled.

*Third Assignment of Error*

{¶36} In his third assignment of error, Gutierrez claims that by denying his consulting expert access to the FRC, CPSU, and grand jury records discussed above, the trial court deprived the defense of the effective use of an expert witness in the area of identifying tainted child-sexual abuse allegations. He alleges that in

-18-

not disclosing all of these items to Dr. Smalldon, the trial court denied Gutierrez his right to present a defense and his right to due process.

{¶37} Gutierrez asked the trial court to hire Dr. Smalldon as a consultant to determine whether the protocols used in the various interviews with A.P. met the mandates of what is required to obtain an accurate disclosure from a child sexual victim. (Apr. 30, 2009 Tr., p. 9.) Dr. Smalldon is a forensic psychologist with some experience in this area. The trial court agreed to retain Dr. Smalldon to assist in determining whether the interrogation questioning "was done in an appropriate manner to avoid any psychological suggestion" and "tainting" of the child's statements. Now Gutierrez claims that he was denied a defense because Dr. Smalldon could not render an opinion without access to the records that were under seal.

{¶38} First, contrary to the arguments in Gutierrez' brief and assignment of error, Dr. Smalldon was never appointed as an expert. The State objected to his lack of credentials in the purported field and the fact that the defense wanted Dr. Smalldon to testify as to what was an ultimate matter for the jury to decide, i.e., whether the child victim was telling the truth. Therefore, Dr. Smalldon was only appointed as a "psychological consultant to assist defense counsel in preparation of the above case for trial." (May 8, 2009, Judgment Entry.)

**{¶39}** As discussed in our response to the second assignment of error, the trial court concluded that the sealed records did not contain any exculpatory evidence or any inconsistencies. Our review of these materials also confirms that the FRC and CSPU records primarily contained only brief summaries of the Therapist's or the investigators' conclusions; there were no detailed records of the questioning/interview process. However, Gutierrez was provided with a copy of the video of the forensic interview with A.P., Detective Tuttle, and Ms. Westrick, conducted only ten days after A.P. disclosed the abuse. This video clearly showed what types of questions were asked and it revealed the demeanor and non-verbal gestures of all of the participants. Dr. Smalldon had access to all of the records that contained any information pertinent to his review.

**{¶40}** The trial court did not err in refusing to release the records filed under seal to Dr. Smalldon after it determined that there was no relevant evidence contained therein. Gutierrez' third assignment of error is overruled.

*Fourth Assignment of Error*

**{¶41}** Gutierrez charges that the trial court erred in allowing hearsay testimony of A.P.'s accusations through her mother; through her Therapist; through the testimony of Detective Tuttle and Ms. Westrick; and, in the admission of A.P.'s forensic interview with Detective Tuttle and Ms. Westrick that was played for the jury. He contends that the trial court violated Ohio's hearsay rules,

and Due Process and Confrontation clause principles when it admitted statements made by the alleged victim to several third parties.

**{¶42}** "Hearsay" is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Evid.R. 801(D) also specifies certain statements which are not considered hearsay, such as when the declarant testifies at trial or hearing and is subject to cross-examination concerning the statement. See Evid.R. 801(D)(1). Generally, hearsay is not admissible unless one of several exceptions to the hearsay rule is applicable. See Evid.R. 802-807.

**{¶43}** The admission or exclusion of relevant evidence rests within the sound discretion of the trial court. *State v. Sage* (1987), 31 Ohio St.3d 173, 510 N.E.2d 343. Absent an abuse of that discretion and a showing of material prejudice, an appellate court will not overturn a trial court's ruling. *State v. Martin* (1985), 19 Ohio St.3d 122, 129, 483 N.E.2d 1157. The abuse-of-discretion standard is defined as "[a]n appellate court's standard for reviewing a decision that is asserted to be grossly unsound, unreasonable, illegal, or unsupported by the evidence." *State v. Boles*, 187 Ohio App.3d 345, 2010-Ohio-278, 932 N.E.2d 345, ¶18, quoting Black's Law Dictionary (8th Ed.2004) 11. However, the question as to whether a defendant's constitutional rights under Confrontation Clause have

been violated is reviewed under a de novo standard. *State v. Smith*, 162 Ohio App.3d 208, 2005-Ohio-3579, 832 N.E.2d 1286, ¶8.

{¶44} At a pretrial evidentiary hearing held on July 7, 2009, the trial court heard evidence regarding the circumstances of the alleged hearsay statements and the court ruled to allow the contested testimony. (Aug. 21, 2009 Decision and Order.) The defense renewed its objections to the admissibility of this evidence at trial. We will address each of the hearsay complaints separately below.

{¶45} (1) *Mother's Testimony*. The trial court allowed A.P.'s Mother to testify as to what A.P. told her Mother the morning she disclosed the sexual abuse, finding that A.P.'s statements constituted an "excited utterance" hearsay exception. Gutierrez argues that A.P.'s statement did not constitute an excited utterance because A.P. did not immediately tell her mother of the abuse, which had supposedly commenced two years earlier. Furthermore, Gutierrez asserts that A.P. was initially calm and composed when she approached her mother and did not become emotional and start crying until her Mother started crying and asked A.P. to tell another relative what had happened.

{¶46} Evid.R. 803(2) defines an "excited utterance" as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Excited utterances are deemed reliable because, by their nature, they do not entail an opportunity for the

declarant to reflect and fabricate or to distort the truth. *State v. Wallace* (1988), 37 Ohio St.3d 87, 88, 524 N.E.2d 466. Courts have also found that a child's young age and naiveté may themselves be factors in favor of trustworthiness. *State v. Muttart*, 116 Ohio St.3d 5, 2007-Ohio-5267, 875 N.E.2d 944, ¶49, fn. 6. This Court has held that the excited utterance exception is to be applied liberally in cases involving out-of-court statements made by children who were victims of sexual abuse on the basis that statements made by young children are often more trustworthy because children have a more limited ability to reflect on past incidents. *State v. Shoop* (1993), 87 Ohio App.3d 462, 472, 622 N.E.2d 655.

{¶47} For an alleged excited utterance to be admissible, four prerequisites must be satisfied: (1) the event must be startling enough to produce a nervous excitement in the declarant, (2) the statement must have been made while the declarant was still under the stress of excitement caused by the event, (3) the statement must relate to the startling event, and (4) the declarant must have personally observed the startling event. *State v. Taylor* (1993), 66 Ohio St.3d 295, 300-301, 612 N.E.2d 316. In analyzing whether a statement is an excited utterance, the Ohio Supreme Court noted that, "[t]he controlling factor is whether the declaration was made under such circumstances as would reasonably show that it resulted from impulse rather than reason and reflection." *State v. Humphries* (1992), 79 Ohio App.3d 589, 598, 607 N.E.2d 921.

{¶48} The record discloses that there were several factors present supporting the trial court's finding that A.P.'s disclosure to her mother was an excited utterance. However, we are concerned about the statement that A.P. made during the forensic interview which indicated that there was reflective thought behind her decision to tell her Mother about the abuse. The detective asked A.P. what had made her decide to tell her Mother. A.P. responded that, "I kept thinking about it and thinking about it cause I didn't want to keep doing it so I told my mom." While we do not believe that this statement, made by a seven-year-old child, necessarily diminishes the reliability of her statement, it does indicate that there was some reason and reflection behind A.P.'s statement that would moderate the applicability of the excited utterance hearsay exception in this instance.

{¶49} However, irrespective as to whether the statements constituted an excited utterance, we find that the admission of the Mother's testimony would be harmless error even if A.P.'s disclosure to her Mother did not constitute a hearsay exception. Although the Mother testified as to what A.P. had told her that morning, A.P.'s Mother wasn't relating that information for "the truth of the matter," because A.P. later testified and explained to the jury what Gutierrez had done to her. The purpose of the Mother's testimony was to explain how she had obtained knowledge of the abuse; to explain the family's history and situation; to discuss A.P.'s behavior and personality, both before and after Gutierrez came into

their lives; to testify as to Gutierrez' reactions when confronted with the abuse; and to provide chronological context into what occurred before and after the disclosure. It was not at all necessary for the Mother to have stated the words that A.P. related to her.

{¶50} Where a declarant is examined on the same matters as contained in an impermissible hearsay statement and where the testimony is essentially cumulative, the admission of any such hearsay statement is harmless. *State v. Tomlinson* (1986), 33 Ohio App.3d 278, 281, 515 N.E.2d 963, 967. In this case, A.P. testified at trial and was available for cross-examination. She testified as to the same acts that she had told her Mother about on the morning of the disclosure and that she later disclosed to her Therapist, who also testified about the sexual abuse. Even if the Mother's testimony concerning A.P.'s statements were hearsay, they were merely cumulative of evidence that was before the jury. Accordingly, admission of these statements would be harmless error. We do not find that, but for their admission, there was a reasonable probability that the outcome of trial would have been different.

{¶51} (2) *The Therapist's Testimony.* The same day that A.P. disclosed the abuse, her Mother called the FRC and requested an emergency appointment. A.P. was asked to tell her Therapist what she had revealed that morning. At first, A.P. was uncomfortable and reluctant to say anything. However, her Mother told A.P.

that she needed to tell the Therapist in her own words, and she did. Gutierrez asserts that the statements A.P. made to her Therapist were not made for the purpose of medical diagnosis and treatment, but were prompted by her Mother's suggestions and were a subterfuge made to create a criminal case against Gutierrez.

{¶52} Hearsay statements made for the purpose of medical diagnosis or treatment are admissible pursuant to Evid.R. 803(4). *State v. Muttart,* 116 Ohio St.3d 5, 2007-Ohio-5267, 875 N.E.2d 944, ¶37; *State v. Dever*, 64 Ohio St.3d 401, 1992-Ohio-41, 596 N.E.2d 436, paragraph two of the syllabus. The rule may also apply to statements made to psychological caregivers, therapists, and social workers. *Muttart* at ¶56[3]; *State v. Chappell* (1994), 97 Ohio App.3d 515, 646 N.E.2d 1191; *State v. Reigle*, 3d Dist. No. 5-2000-14, 2000-Ohio-1786. The salient inquiry is whether the child's statements were made for purposes of diagnosis and treatment rather than for some other purpose. *Muttart* at ¶47.

{¶53} Prior to their admission, the trial court considered the statements A.P. made to her Therapist and considered the circumstances surrounding the making of the hearsay statements and the several factors lending credibility to the statements. The trial court found that the Therapist was a licensed clinical counselor whose job at the FRC consisted of doing diagnostic assessments and

---

[3] We note that, in *State v. Muttart,* Ms. Crego-Stahl was one of the therapists whose statement the Ohio Supreme Court found was not hearsay. Ms. Crego-Stahl was working at the FRC at the time, too.

providing treatments through outpatient therapy and play therapy. A.P. had been counseling with Ms. Crego-Stahl since May of 2007, and had an on-going counselor-patient relationship. Additionally, the Mother took A.P. to Crego-Stahl's office immediately after the disclosure of sexual abuse for an emergency session and prior to any contact with law enforcement. Ms. Crego-Stahl continued to treat A.P. afterwards to help her deal with the issues resulting from the abuse. Based on all of the circumstances surrounding the child's disclosure to her Therapist, the trial court did not abuse its discretion in finding that the Therapist's statements qualified as a hearsay exception under Evid.R. 803(4).

{¶54} (3) *Detective Tuttle's and Ms. Westrick's Testimony.* The out-of-court statements made by A.P. to Detective Tuttle and Ms. Westrick were hearsay. However, neither the detective nor Ms. Westrick related those statements to the jury during their testimony. Their testimony discussed the circumstances of their interview with A.P., their training and experience in objectively questioning child sexual victims, and their personal observations as to A.P.'s attitude and demeanor, and how it changed when she talked about Gutierrez and the abuse.

{¶55} Both also testified that although there were no physical findings after A.P.'s examination by a SANE (Sexual Assault Nurse Examiner) nurse, that did not necessarily rule out sexual abuse. In fact, it was fairly typical for child victims of sexual abuse not to have physical signs of abuse. Ms. Westrick and the

detective also explained how it was not unusual for a child to later reveal additional sexual abuse that was not initially disclosed and share the information in stages. We do not find that any of the testimony of Detective Tuttle or Ms. Westrick consisted of relating statements made by A.P. for the purpose of proving the truth of those statements.

{¶56} (4) *Forensic Interview Video.* Gutierrez contends that no hearsay exception applied to the playing and admission of the forensic interview that Detective Tuttle and Ms. Westrick conducted with A.P. He argues that playing the video may have violated his Confrontation Clause rights and that it also constituted hearsay and improper bolstering on the part of the State.

{¶57} The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that: " * * * [i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him." *Crawford v. Washington* (2004), 541 U.S. 36, 38, 124 S.Ct. 1354, 158 L.Ed.2d 177. See, also, *State v. Stahl*, 111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834, ¶13. In *Crawford*, the United States Supreme Court determined that testimonial statements by witnesses are inadmissible unless the declarant is unavailable to testify and the defendant had a prior opportunity for cross-examination. 541 U.S. at 59. Significantly, however, the Court in *Crawford* also noted that, " * * * when the declarant appears for cross-examination at trial,

the Confrontation Clause places no constraints at all on the use of his prior testimonial statements. * * * The Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it." *Id.* at 59, fn. 9 (internal citations omitted). See, also, *State v. Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742, 933, N.E.2d 775, at paragraph one of the syllabus.

{¶58} Although the video contained prior testimonial statements by A.P., there was no Confrontation Clause violation in this case because A.P. did testify at trial and Gutierrez had the opportunity to cross-examine her on all of the statements that were made in the video. Gutierrez concedes that A.P. testified, yet contends that a *Crawford* violation would have occurred if this Court had found that A.P. was not competent to testify. Having found that A.P. was competent to testify, and given that Gutierrez had a full opportunity to cross-examine her and the other participants in the forensic interview, we find that the admission of the video did not violate Gutierrez' Confrontation Clause rights.

{¶59} Gutierrez also complains that the testimony on the tape amounted to hearsay and improper "bolstering." We find that the admission of the video was not improper bolstering, but that it was properly admitted under Evid.R. 801(D), which provides in pertinent part:

> **(D) Statements Which Are Not Hearsay. A statement is not hearsay if:**

(1) **Prior Statement by Witness. The declarant testifies at trial or hearing and is subject to cross-examination concerning the statement, and the statement is * * * (b) consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive, * * *.**

{¶60} Throughout the entire trial, the defense attempted to show that A.P. was a chronic liar. The defense also impugned the techniques used to question A.P. and implied that her accusations may have been the result of suggestive, coercive, or leading questioning techniques. Because Gutierrez raised these issues, it was proper for the State to show the video for the purpose of rebutting these arguments. In the tape, the jury can see the type of questions that were asked and discern for themselves whether Detective Tuttle and Ms. Westrick were trying to improperly influence A.P. It also gave the jury the opportunity to observe A.P. tell what had happened near the time of the abuse when the memories were fresh in her mind. As the Ohio Supreme Court has stated, these types of observations can be very useful.

> **We believe the live testimony of a child who has claimed abuse will in most cases enhance the reliability of the fact-finding process. Videotaping or recording the interviews in which the out-of-court statements of the child are obtained would further enhance the integrity of the fact-finding proceeding. In many instances, Evid.R. 801(D)(1) or other Rules of Evidence would allow for the admission of the audio tapes or videotapes. * * * *If taping occurs and the tape is actually admitted into evidence, the trier of fact would have the benefit of the child's actual words and at least some insight as to the child's demeanor. The trial court***

*also would have the benefit of the actual questions or conversation which led up to the child's indication that an individual had abused the child.* **Certainly the questions asked can be a significant factor in determining the reliability of the response, as the Supreme Court of the United States acknowledged in** *Idaho v. Wright***.**

(Emphasis added.) *State v. Storch*, 66 Ohio St.3d 280, 292, 1993-Ohio-38, 612 N.E.2d 305

{¶61} Gutierrez strongly complained about A.P.'s credibility throughout the entire trial process. The trial took place nearly two years after the last episode of abuse. By viewing the video, the jury could see the child's demeanor at this time, when she was seven years old, and judge her credibility for themselves, as well as hear the exact type of questioning that took place to elicit her disclosure. The admission of the video testimony was proper under Evid.R. 801(D), and it did not violate Gutierrez' Confrontation Clause rights because A.P. and the other witnesses testified at trial and were available for cross-examination.

{¶62} Based on all of the above, we find that the trial court did not violate any evidentiary rules or Gutierrez' constitutional rights. The fourth assignment of error is overruled.

*Fifth Assignment of Error*

{¶63} In this assignment of error, Gutierrez alleges that the trial court erred by failing to excuse one of the jurors for cause and that the jury's composition

violated his right to an impartial jury. Specifically, Gutierrez charges that Juror No. 8 should have been excused for cause because she had three people in her life who had been raped or abused. He further complains that the composition of the jury violated his constitutional rights to an impartial jury because many of the other jurors were predisposed to finding him guilty because they had friends or family members who were victims of sexual abuse; they had connections with law enforcement personnel; and/or, they worked together for the same employer.

{¶64} Both the Sixth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution provide that a criminal defendant is entitled to a speedy and public trial "by an impartial jury." The purpose of voir dire is to examine prospective jurors to determine whether they have both the statutory qualification of a juror and are free from bias or prejudice. *Pavilonis v. Valentine*, (1929), 120 Ohio St. 154, 165 N.E. 730, at paragraph one of the syllabus. Under Crim.R. 24, a defendant may challenge for cause:

> **[t]hat the juror is possessed of a state of mind evincing enmity or bias toward the defendant or the state, but no person summoned as a juror shall be disqualified by reason of a previously formed or expressed opinion with reference to the guilt or innocence of the accused, if the court is satisfied, from the examination of the juror or from other evidence that the juror will render an impartial verdict according to the law and the evidence submitted to the jury at the trial.**

Crim.R. 24(C)(9); *State v. Farr*, 3d Dist. No. 13-06-16, 2007-Ohio-3136, ¶7. Pursuant to R.C. 2313.42, a prospective juror may be challenged for cause if he "discloses by his answers that he cannot be a fair and impartial juror or will not follow the law as given to him by the court." R.C. 2313.42(J). See, also, Crim.R. 24(C)(9) (a challenge for cause may be made when the prospective juror "is possessed of a state of mind evincing enmity or bias toward the defendant or the state.") When a juror's impartiality is at issue, the relevant question is "did a juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed." *Dennis v. Mitchell* (C.A.6, 2003), 354 F.3d 511, 520, quoting *Patton v. Yount* (1984), 467 U.S. 1025, 1036, 104 S.Ct. 2885, 81 L.Ed.2d 847.

{¶65} "A trial court's ruling on a challenge for cause will not be disturbed on appeal unless it is manifestly arbitrary and unsupported by substantial testimony, so as to constitute an abuse of discretion." *State v. Williams*, 79 Ohio St.3d 1, 8, 1997-Ohio-407, 679 N.E.2d 646, 654. The trial judge has the benefit of observing the prospective jurors' demeanor and body language, and therefore, "deference must be paid to the trial judge who sees and hears the juror." Id., quoting *Wainwright v. Witt* (1985), 469 U.S. 412, 426, 105 S.Ct. 844, 853, 83 L.Ed.2d 841, 853.

{¶66} During an individual voir dire conducted in chambers, Juror No. 8 disclosed that she had a daughter and a good friend who had been raped, and a sister that had been abused. Gutierrez contends that Juror No. 8 should have been excused because she admitted to the court that it would "be difficult" to disregard her life experiences and she might be "emotional." (Tr. at 167-68.) However, upon further inquiry, it was learned that the juror did not know many details of these incidents. The situation with her friend occurred about twenty years earlier. The marital situation involving her sister was resolved six to seven years ago when her sister was divorced. The situation involving her daughter had also occurred more than five years earlier when her daughter was in college. None of the incidents were reported to the police. Upon further questioning, the juror acknowledged that her situations were very different from a stepfather being accused of raping a seven-year-old child.

> **Q: Given the nature of the charges filed in this case, would you rather not hear this case given your own personal experiences opposed to some other case for instance?**
>
> **Juror 8: This is different. I understand it's different. I would say definitely it would be easier to be not emotional or not as emotionally tied to a different type of case.**
>
> **\* \* \***
>
> **Q: I guess it's back to you. What is your gut telling you about being able to fairly and impartially judge this case only on**

> **the evidence in the courtroom, exhibits, if any, Court's instructions on Ohio law?**
>
> **Juror 8:      I think I can do it.  I may be more emotional than other people, but I mean, it's the situation.**

(Tr. at 171-72.)  The trial court declined to excuse Juror No. 8 for cause because she was willing to do her best to disregard the history she brought to court. Gutierrez' attorney later used one of his four peremptory challenges to excuse Juror No. 8.  Now Gutierrez complains that he was prejudiced because this precluded him from using that peremptory challenge on one of the other remaining jurors.  See *State v. Broom* (1988), 40 Ohio St.3d 277, 287, 533 N.E.2d 682.

**{¶67}** Gutierrez relied extensively upon a decision from the Tenth District Court of Appeals in support of his argument that the trial court erred when it failed to excuse Juror No. 8.  See *State v. Zerla*, Franklin App. No. 91AP-562, 1992 WL 55433, *2-3.  The Tenth District Court of Appeals stated that "the presence of a *recent rape victim on a jury* in a rape trial" could compromise the defendant's right to an impartial jury.  (Emphasis added.)  Id.  In *Zerla*, the defendant was being tried for rape and kidnapping, and the juror herself had been raped only three years earlier and was still suffering from trauma and undergoing counseling. Here, Juror No. 8 was not the victim herself, and the incidents occurred many years prior.  The situation in this case is completely distinguishable from that in *Zerla* and its holding is not applicable.

{¶68} It was the task of the trial judge to observe the prospective jurors and determine whether, after explanation, they could indeed follow the law and be fair and impartial. The issues pertaining to Juror No. 8 involved different situations, happened many years ago, and the juror confirmed that they would not affect her decision in this case. In addition, the court advised counsel that there would be two alternate jurors available for substitution in the event one of the jurors, i.e., Juror No. 8, realized during trial that she could not be fair and impartial. There is nothing to show the trial court abused its discretion in not excusing Juror No. 8 for cause.

{¶69} Gutierrez also complains that once the jury was selected, the jury as a whole could not be fair and impartial. However, there was never any challenge to the final composition of the jury, which results in a waiver of all but plain error. Plain error does not exist unless it can be said that, but for the error, the outcome of the trial clearly would have been different. *State v. Long* (1978), 53 Ohio St.2d 91, 97, 372 N.E. 2d 804. Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice. Id.

{¶70} Gutierrez claims that *every one* of the twelve jurors had a relevant experience or connection that would raise doubts about his or her impartiality. However, this conclusion is arrived at by taking the jurors' various comments

during voir dire out of context. When the entire inquiry of each juror is reviewed, it becomes evident that most of the issues were extremely minor or tenuous and not likely to cause any bias. Furthermore, all of the jurors were carefully questioned at great length and they affirmatively indicated that their experiences/connections would not influence them in any way or affect their ability to be fair.

{¶71} For example, one juror's son went to the same school as A.P., but she had no idea whether or not they were in the same class or if he knew her. Another juror's husband was cousin to a sheriff (who was not involved in the trial), but they did not associate with him other than once every five years when the family had a "cousins party." Three of the jurors worked for the same large employer in town, Marathon, but no one had any kind of supervisory or influential position with respect to the others. One of the Marathon jurors did not know the other two at all. The other two knew each other casually, but worked in different areas.

{¶72} Two of the jurors did have a family member who had been molested, and two of the jurors had been molested themselves when they were younger. However, these incidents had all happened at least twenty to thirty years earlier. Only one of the incidents had ever been reported or prosecuted. Each juror was

confident that he or she could be fair and impartial. All explained why they could put aside any personal issues and judge this case solely on its own merits.

**{¶73}** The record does not reveal any indication that any of the jurors had a problem with fairness and impartiality. Gutierrez' allegations are based upon speculation rather than any actual concerns expressed by the jurors, the attorneys, or the trial court. Furthermore, we must give due deference to the trial judge who was actually able to see and hear the potential jurors during the entire day-long voir dire process. Gutierrez has failed to establish plain error by the trial court. The fifth assignment of error is overruled.

*Sixth Assignment of Error*

**{¶74}** Gutierrez claims that there was insufficient evidence as a matter of law to convict him of five of the six counts and that the convictions were also against the manifest weight of the evidence. Gutierrez asserts that counts five and six were not supported by sufficient evidence because there was no testimony from the victim that any digital penetration or anal rape occurred on July 13, 2010; and, that counts one, two and three did not meet the sufficiency standard because the victim did not testify that the sexual conduct occurred in the date-range set forth in the indictment. He also argues that the verdict was against the manifest weight of the evidence because the State's only evidence was the testimony of a young child who had credibility issues. Gutierrez claims that all of the other

witnesses merely repeated what they had been told by A.P. and did not see, hear or otherwise witness any of the alleged events.

{¶75} When reviewing the sufficiency of the evidence, our inquiry focuses primarily upon the adequacy of the evidence; that is, whether the evidence submitted at trial, if believed, could reasonably support a finding of guilt beyond a reasonable doubt. See *State v. Thompkins*, 78 Ohio St.3d 380, 386, 1997–Ohio– 52, 678 N.E.2d 541, 546 (stating, "sufficiency is the test of adequacy"); *State v. Jenks* (1991), 61 Ohio St.3d 259, 273, 574 N.E.2d 492, 503. The standard of review is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt. *Jenks,* supra; *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560. This test raises a question of law and does not allow the court to weigh the evidence. *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717.

{¶76} Gutierrez was found guilty of violating R.C. 2907.02(A)(1)(b), which states:

> **(A)(1) No person shall engage in sexual conduct with another who is not the spouse of the offender * * *, when any of the following applies:**
>
> **\* \* \***
>
> **(b) The other person is less than thirteen years of age * * *.**

-39-

**(B) Whoever violates this section is guilty of rape, a felony of the first degree.  \* \* \*  [I]f the victim under division (A)(1)(b) of this section is less than ten years of age, \* \* \* the court may impose upon the offender a term of life without parole.**

{¶77} Gutierrez complains that the victim did not testify that the sexual conduct occurred in the date-range set forth in the indictment for the first three counts, between September 5, 2006 and June 8, 2007.  However, A.P. did testify that each of the three different sex acts occurred more than one time when she was in kindergarten.  (Trial Tr., p. 368.)  And, A.P.'s Mother testified that A.P. was born in December of 2000, and that she attended kindergarten during the " '06, '07 school year" which "began in September and ended in May or June."  A.P.'s testimony was as follows:

**Q.   I want to talk about [Gutierrez], okay.  Is there anything that ever happened [that Gutierrez] made you do that you didn't like?**

**A.   Yes.**

**Q.   Did this happen one time or more than one time?**

**A.   More than one time.**

**Q.   When did it start happening?**

**A.   Kindergarten**

(Trial Tr., pp. 358-59.)   Further questioning confirmed that these things would happen in her bedroom in her home in Findlay.

**Q.   * * * [A.P.], can you tell us what it is that [Gutierrez] made you do that you didn't like?**

**A.   May I write it?**

**\* \* \***

**Q.   Thank you.  [A.P.], why is it you wanted to write it?**

**A.   Because I don't like saying it.**

(Id. at 360.)  The State then displayed the paper with A.P.'s writing for all to see. A.P. wrote:  "he made me suck on his P.P. and put his P.P. in my butt and his finger in my P.P."  (State's Ex. No. 1.)  A.P. confirmed that the "he" she was referring to was Gutierrez, and both the State and the defense questioned A.P. about her written statement.  It was also established, through questioning and having A.P. circle the appropriate body parts on anatomical drawings, that her reference to Gutierrez's "P.P." was his penis, the reference to A.P.'s "P.P." was her vagina, and for "butt," she circled the anal region of the buttocks.  (Trial Tr., pp. 360-67.)  She further confirmed that it started when she was "in kindergarten" and that "each of these different things" happened more than one time.  (Id. at 368.)  There was clearly sufficient evidence to prove the occurrence of the rapes within the time frames of the first three counts in the indictment.

{¶78} As to counts five and six, Gutierrez claims they were not supported by sufficient evidence because there was no testimony from the victim that any

digital penetration or anal rape occurred on or about July 13, 2010.  We disagree.

The State asked A.P.:

> **Q.   When was the last time that something like this happened with you and [Gutierrez]?**
>
> **A.   Three years ago, maybe two.**
>
> **Q.   Okay.  Do you remember a trip you had taken close to that time?**
>
> **A.   I think it was to the zoo.**
>
> **Q.   To the zoo.  We were hearing some talk about a place called The Wilds.  You ever been to the Wilds?**
>
> **A.   Yes, that's where it was.**
>
> **Q.   Is that like a zoo?**
>
> **A.   Yeah.**

(Emphasis added.) (Id. at 359.)  After a few more questions about the animals and what she saw at The Wilds, the State then asked, "can you tell us what it is that Ronnie made you do that you didn't like?"  (Id. at 360.)  It was at this point that A.P. wrote on the paper, specifying all three sex acts.  Although A.P. didn't state the date of her trip to The Wilds, her Mother had previously testified about the family outing that the three of them had taken to The Wilds during the weekend of July 12 and 13, 2008, and the fact that Gutierrez had put A.P. to bed that

evening of July 13th after they returned home. (Id. at 308.) It was on the morning of the July 14th that A.P. disclosed that Gutierrez had been abusing her.

{¶79} A challenge to the sufficiency of the evidence requires us to construe the evidence, and all reasonable inferences, in favor of the prosecution. Based upon this standard, we find that the evidence was sufficient to allow "any rational trier of fact [to find] the essential elements of the crime beyond a reasonable doubt." See *Jackson*, 443 U.S. at 319, 99 S.Ct. 2781, 61 L.Ed.2d 560; *Jenks*, at paragraph two of the syllabus.

{¶80} Next, Gutierrez argues that the verdict was against the manifest weight of the evidence because the only evidence was the testimony of a young child who had credibility issues. He asserts that all of the other witnesses merely repeated what they had been told by A.P.

{¶81} A challenge to a conviction based on the manifest weight of the evidence concerns "the inclination of the *greater amount of credible evidence*, offered in a trial to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its *effect in inducing belief.*" (Emphasis sic.) *State v. Thompkins*, 78 Ohio St.3d at 387, 678

-43-

N.E.2d 541. A new trial should be granted only in the exceptional case in which the evidence weighs heavily against conviction. Id. Although the appellate court acts as a "thirteenth juror," it still must give due deference to the findings made by the fact-finder. *State v. Thompson* (1998), 127 Ohio App.3d 511, 529, 713 N.E.2d 456.

> **The fact-finder, being the jury, occupies a superior position in determining credibility. The fact-finder can hear and see as well as observe the body language, evaluate voice inflections, observe hand gestures, perceive the interplay between the witness and the examiner, and watch the witness' reaction to exhibits and the like. Determining credibility from a sterile transcript is a Herculean endeavor. A reviewing court must, therefore, accord due deference to the credibility determinations made by the fact-finder.**

Id. To reverse the judgment of a trial court on the weight of the evidence based upon a jury's verdict, a unanimous concurrence of all three judges on the reviewing panel is required. *Thompkins*, at paragraph four of the syllabus.

{¶82} Gutierrez continues to discount A.P.'s testimony and impugn her credibility. However, not only did the trial court find that A.P. was competent to testify, as discussed above, but both the State and defense counsel further questioned A.P. at trial as to her understanding of the difference between the truth and a lie, and her responsibility to tell the truth. Her testimony appeared to be reasonable and consistent, and the jury was in a superior position to personally observe A.P. and judge her credibility.

{¶83} It is true that A.P. was the only one able to testify from her first-hand personal experience. This is typical in cases of sexual abuse where there is rarely a third-party witness. However, the State's other witnesses did much more than merely reiterate what A.P. had told them. They provided a considerable amount of additional information that could be helpful to a jury.

{¶84} A.P.'s Mother testified how A.P. had been a very happy, bright, sweet and loving child prior to Gutierrez being a part of their lives. She then disclosed how A.P.'s behavior had changed for the worse after she married Gutierrez. The Mother testified as to A.P.'s demeanor the morning A.P. disclosed the abuse, and how she was crying and was extremely upset. She also testified that A.P. had not had much contact with her biological father prior to the time of the disclosure, and that this was not a matter of a custody dispute. Therefore, A.P.'s claims were not motivated by those factors.

{¶85} Detective Tuttle and Ms. Westrick testified as to their role in the investigation and specifically, the forensic interview they participated in with A.P. Both testified as to their extensive experience and training in questioning child victims in a "neutral fact finding interview," and how the main protocol was to never lead the child. They testified how A.P.'s disclosure was the result of open-ended questioning, and discussed how her demeanor changed drastically when discussing the abuse, with becoming sullen and withdrawn. Both testified that

even though A.P.'s medical exam did not reveal any physical findings, that was often typical in the case of child victims and did not rule out sexual abuse.

{¶86} Detective Tuttle had also interviewed Gutierrez. Although Gutierrez denied the sexual abuse, he did acknowledge that he regularly put A.P. to bed, by himself and with the bedroom door closed. Gutierrez also admitted to rubbing A.P.'s stomach or back "to help A.P. fall asleep." (Tr. at 406-407.)

{¶87} A.P.'s Therapist testified about how A.P. disclosed the abuse to her during an emergency session late on July 14th. It was after this disclosure that the Therapist called the CPSU. She explained that, based upon her experience and training in dealing with children in sexual abuse cases, A.P.'s resultant feelings of guilt – and thinking that she had done something bad -- was a common reaction. (Tr. at p. 498-99.)

{¶88} The Therapist explained how she used a workbook with A.P. in subsequent counseling sessions to help A.P. talk about the abuse so she could process it, get rid of the associated bad dreams, and eventually begin to feel safe again. The workbook, "No More Hurt," was used to help A.P. work through memories in a safe way and with drawings. It was during these sessions that A.P. eventually disclosed that in addition to the oral sex, Gutierrez "put his fingers in her PP and stuck his PP in her butt." (Id. at 501.) The Therapist diagnosed A.P.

as having PTSD (post-traumatic stress disorder), meaning she had a traumatic experience and the memories keep coming back and bothering her. (Id. at 502.)

{¶89} We have already found that there was sufficient evidence to establish that Gutierrez had performed the three sexual acts within each of the specified date ranges. We have also explained why there was ample reason for the jury to find that A.P.'s testimony was believable, and how the testimony of the State's other witnesses went far beyond merely repeating A.P.'s allegations, and it provided considerable additional information to help the jury. The jury was free to believe or disbelieve testimony as it saw fit and apply it accordingly. Because we find that the record does not establish that the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed, we overrule Gutierrez's sixth assignment of error.

*Seventh Assignment of Error*

{¶90} In his seventh assignment of error, Gutierrez asserts that his sentence is contrary to law because the judgment entry failed to properly impose postrelease control ("PRC"). Gutierrez complains that the judgment entry advised that he faced "up to five years" of PRC, rather than imposing the correct definitive term of five years of PRC.

{¶91} At the sentencing hearing, after imposing multiple life sentences and life sentences without the possibility of parole, the trial court addressed the issue of PRC and stated on the record:

> **In view of the sentence I have imposed, Mr. Gutierrez, the following is probably not applicable but the law tells me that I have to tell you that if you are ever released from the Ohio Department of Rehabilitation and correction, *you are mandatorily subject to five years of supervision on post-release control * * *. For first degree felony sex offenses, which these are, it's five years mandatory.* As I say those are probably wasted words because in the context of the sentence I just imposed, I don't think they will become applicable.**

(Emphasis added.) (Mar. 18, 2010 Sentencing Hearing, p. 19.) Although the trial court correctly informed Gutierrez of the imposition of PRC at the sentencing hearing, Gutierrez is correct in stating that the judgment entry did not reflect what actually occurred at the sentencing hearing and it incorrectly indicated that he was subject to "up to" five years of PRC.

{¶92} R.C. 2929.191, enacted as part of H.B. 137, establishes a procedure to remedy sentences that fail to properly impose a term of PRC for defendants, like Gutierrez, who were sentenced on or after its July 11, 2006 effective date. See *State v. Singleton*, 124 Ohio St.3d 173, 2009-Ohio-6434, 920 N.E.2d 958, paragraph two of the syllabus. It is only the PRC aspect of a sentence that must be rectified and the remainder of the sentence remains valid under the principles of

res judicata. *State v. Fischer*, 128 Ohio St.3d 92, 2010-Ohio-6238, 942 N.E.2d 332, ¶17.

{¶93} Furthermore, because the trial court correctly imposed PRC at the hearing, it would appear that the incorrect language in the judgment entry was a clerical error or mistake. "The term 'clerical mistake' refers to a mistake or omission, mechanical in nature and apparent on the record, which does not involve a legal decision or judgment." See, e.g., *State v. Brown*, 136 Ohio App.3d 816, 819-820, 2000-Ohio-1616, 737 N.E.2d 1057. Courts retain continuing jurisdiction to correct clerical errors in judgments by nunc pro tunc entries to reflect what the court actually decided. *State ex rel. Cruzado v. Zaleski*, 111 Ohio St.3d 353, 2006-Ohio-5795, 856 N.E.2d 263, ¶18–19; Crim.R. 36. The Ohio Supreme Court has recently affirmed that the trial court is authorized to correct the mistake by nunc pro tunc entry without holding a new sentencing hearing when a defendant is notified of the proper term of PRC at the sentencing hearing and the error is merely clerical in nature. *State ex rel. Womack v. Marsh*, 128 Ohio St.3d 303, 2011-Ohio-229, 943 N.E.2d 1010, ¶14.

{¶94} Therefore, Gutierrez' seventh assignment of error is affirmed. The cause is remanded to the trial court for further proceedings consistent with this decision.

*Eighth Assignment of Error*

**{¶95}** In his final assignment of error, Gutierrez claims that he was denied the effective assistance of counsel[4] under the standard set forth in *Strickland v. Washington* and *State v. Bradley*. Specifically, Gutierrez submits that counsel acted deficiently in four instances: (1) counsel did not object to the impartial composition of the jury, as set forth in the Fifth Assignment of Error; (2) counsel failed to object when A.P. was permitted to write her allegations of sexual abuse and he should have reiterated *Crawford* objections to the forensic interview evidence; (3) counsel performed deficiently by not utilizing the information that A.P. had tested positively for genital herpes, while Gutierrez had not, for purposes of impeachment and to further the line of defense that any sex acts done upon A.P. were done by persons other than Gutierrez; and (4) by failing to object to the trial court's denial of questioning concerning Detective Tuttle's investigation of the trailer park for registered sex offenders.

**{¶96}** To establish ineffective assistance of counsel, a defendant must show (1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable

---

[4] Gutierrez was originally represented by two attorneys from the Hancock County Public Defender's Office. Four days before the scheduled September 14, 2009 trial date, Gutierrez requested new counsel who were not affiliated with Hancock County. Gutierrez was concerned that his current counsel had "too many other cases to focus exactly on what [he] want[ed]" and he felt that he needed "another opinion on [his] case." (Sept. 10, 2009 Tr., pp. 6-7.) A new attorney from the Ohio Public Defender's Office in Columbus was appointed and the trial was rescheduled for January 2010, and then moved to March 2010.

probability that but for counsel's errors, the proceeding's result would have been different. *Strickland v. Washington* (1984), 466 U.S. 668, 687-688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraphs two and three of the syllabus. There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, and that strategy and tactical decisions exercised by defense counsel are well within the range of professionally reasonable judgment and need not be analyzed by a reviewing court. S*tate v. Robinson* (1996), 108 Ohio App.3d 428, 670 N.E.2d 1077.

{¶97} First, Gutierrez complains that his counsel was ineffective because he did not object to the "impartial composition of the jury." The record shows that both attorneys and the trial court carefully questioned each juror, both during the public voir dire process and privately in chambers, as was appropriate for all of the jurors who had indicated on their questionnaires that they knew someone "who had ever been the victim of physical, sexual or emotional abuse." As discussed in our review of the Fifth Assignment of Error, the issues complained of by Gutierrez were usually not problematic and/or they had happened long ago in the past. The record shows that all of the jurors who were seated were certain that they could be fair and impartial. We do not find that any objection would have resulted in the trial court finding cause to dismiss any of the jurors who were seated.

{¶98} Furthermore, decisions on the exercise of jury challenges are a part of trial strategy. *State v. Goodwin* (1999), 84 Ohio St.3d 331, 341, 703 N.E.2d 1251. Trial counsel, who observe the jurors firsthand, are in a much better position to determine whether a prospective juror should be challenged. See *State v. Keith* 79 Ohio St.3d 514, 521, 1997-Ohio-367, 684 N.E.2d 47. All of the jurors complained of by Gutierrez stated that they would be able to base their decisions solely on the evidence presented in court and could fairly and impartially decide the case. Because none of the jurors indicated any bias or prejudice, Gutierrez has not shown that having this jury panel denied him a fair trial. See *State v. Trimble*, 122 Ohio St.3d 297, 311, 2009-Ohio-2961, 911 N.E.2d 242, 262, ¶99. Therefore, counsel was not ineffective for failing to raise such an objection.

{¶99} Next, Gutierrez claims that counsel was ineffective for failing to object when A.P. was permitted to write her allegations of sexual abuse as opposed to requiring her to say out loud what Gutierrez allegedly did to her sexually. He claims that this accommodation violated his right to a fair trial and "confrontation" because A.P. was, in effect, "not available to actually testify to the jury" because she wrote out her allegations.

{¶100} We find that this argument fails for several reasons. The protection of child sexual abuse victims is an important public policy recognized in Ohio. *State v. Eastham* (1988), 39 Ohio St.3d 307, 310, 530 N.E.2d 409, 411-412.

Special accommodations/procedures are often allowed for child victims of sexual abuse to minimize the emotional trauma and stress of having to testify in a courtroom full of strangers, along with accused. See, e.g., *In re Howard* (1997), 119 Ohio App.3d 33, 38, 694 N.E.2d 488 (child victims allowed to testify via closed-circuit T.V. from another room); *State v. Miller* (1988), 44 Ohio App.3d 42, 45, 541 N.E.2d 105 (it is within court's discretion to allow state to ask leading questions of child rape victim); *State v. Johnson* (1986), 38 Ohio App.3d 152, 155, 528 N.E.2d 567 (listing special procedures used by various courts, such as allowing the child to sit in support person's lap while testifying; allowing the child to whisper responses to the prosecutor; allowing child to point rather than state out loud).

{¶101} Evid.R. 611(A) provides that a trial court "shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) *protect witnesses from harassment or undue embarrassment*." (Emphasis added.) It is within the trial court's discretion as to how evidence should be presented. The trial court had already ruled that special procedures would be permitted at trial in order to allow A.P. to testify and develop the case for the jury in a manner that would spare her "discomfort and embarrassment." (Aug. 21, 2009 Order.) Again,

Gutierrez cannot show that objecting to the written statement that was permitted for a small portion of A.P.'s testimony would have had any likelihood of success.

{¶102} Additionally, "the Confrontation Clauses were written into our Constitutions '*to secure for the opponent the opportunity of cross-examination.* * * *'" (Emphasis sic; citations omitted.) *State v. Self* (1990), 56 Ohio St.3d 73, 76, 564 N.E.2d 446, 450. Although A.P. wrote her initial statements describing the specific sexual acts, defense counsel had a full opportunity to cross examine her and ask any questions he wanted to concerning the statements that A.P. had written. The written testimony was fully displayed in open court for everyone to see. Therefore, counsel was not ineffective for failing to raise a Confrontation Clause objection because A.P. was available to testify and be cross-examined. Her written responses did not deprive Gutierrez of any of his constitutional rights. As we find that there was no established error in the special procedures allowed for the child-victim, Gutierrez' trial counsel was not ineffective for failing to object.

{¶103} Third, Gutierrez claimed that trial counsel had information that A.P. had tested positively for genital herpes, while Gutierrez had not. He asserts that counsel performed deficiently by not utilizing that information for impeachment purposes against A.P. to argue that her contraction of the STD "from someone

other than Gutierrez" accounted for her knowledge of sex acts and to further the line of defense that any sex acts upon A.P. were done by someone else.

{¶104} On January 15, 2010, the State filed a motion in limine pursuant to R.C. 2907.02(E) (part of Ohio's "rape shield" laws) with regards to A.P.'s medical test results for genital herpes. The State's basis for this motion was three-fold. First, and contrary to Gutierrez' claim, the State contended he was never tested for genital herpes. We do not find any evidence of a negative test result for Gutierrez[5] within the record. Secondly, the State argued that genital warts can be transmitted from a person who carries the virus, even though that person has no visible warts. And third, the medical report from the victim's examination indicated that the infection from which the victim suffers could also be from a non-sexual transmission. Gutierrez' counsel did not file a response or objection. At the hearing on the matter, Gutierrez' counsel stated:

> **I have, after some conversation and thought and research, elected not to file a response to that motion in limine. I will say to the Court, I am not agreeing with the prosecution. I'm simply electing, given the state of the law, not to file a response to that motion in limine. And, I will let the court use its own discretion in terms of ruling appropriately.**

(Feb. 18, 2010 Hearing, p. 4.) Gutierrez' counsel researched and considered the matter carefully before making the calculated decision not to oppose the motion in

---

[5] Although Gutierrez was ordered to undergo testing for STDs, there is no indication in the record as to whether he obtained that testing. There was a pre-trial request by Gutierrez' counsel to rescind the permission that he had previously given pertaining to the release of his medical information.

limine. A reviewing court "will not second-guess trial strategy decisions." *State v. Mason*, 82 Ohio St.3d 144, 157, 1998-Ohio-370, 694 N.E.2d 932. It would appear that trial counsel's decision not to raise this matter was based upon a thorough review of the facts and the law and did not constitute ineffective assistance of counsel.

{¶105} And finally, Gutierrez claims that counsel erred by not lodging an objection on confrontation grounds to the trial court's ruling against questioning Detective Tuttle concerning his investigation of the trailer park for registered sex offenders. Counsel attempted to ask the detective if there were any other known sex offenders living in the area with whom A.P. might have had contact. The State objected on the grounds of relevancy and the trial court sustained the objection.

{¶106} "The scope of cross-examination falls within the ambit of trial strategy, and debatable trial tactics do not establish ineffective assistance of counsel." *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶101. In addition, to fairly assess counsel's performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674. Gutierrez has not asserted that his trial counsel had any facts or information, beyond mere conjecture and irrelevant speculation, with which to

counter the State's objection. Therefore, we do not find that his acquiescence to the trial court's evidentiary ruling on his cross-examination can be considered ineffective.

{¶107} Based on all of the above, there is no merit to Gutierrez' claims that his trial counsel was ineffective. The eighth assignment of error is overruled.

{¶108} Having found no error prejudicial to the Appellant herein in the particulars assigned and argued in Assignments of Error One, Two, Three, Four, Five, Six, and Eight, we affirm the judgment of the trial court as to those assignments of error. However, we find that Assignment of Error Seven was well-taken and we hereby remand the matter to the trial court, solely pertaining to the matter of following the appropriate procedure to reflect the proper postrelease control.

*Judgment Affirmed in Part,*
*Reversed in Part and*
*Cause Remanded*

**ROGERS, P.J. concurs, and concurs in Judgment Only as to Assignment of Error #4.**
**PRESTON, J., concurs.**

**/jlr57**