[Cite as *State v. Deanda*, 2014-Ohio-3668.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SENECA COUNTY

STATE OF OHIO,

     PLAINTIFF-APPELLEE,                   CASE NO.  13-10-23

     v.

DAVID L. DEANDA,                         O P I N I O N

     DEFENDANT-APPELLANT.

Appeal from Seneca County Common Pleas Court
Trial Court No. 09-CR-0210

**Judgment Affirmed**

Date of Decision:   August 25, 2014

APPEARANCES:

    *John H. Kahler, II*  for Appellant

    *Derek W. DeVine and Rhonda L. Best*  for Appellee

Case No. 13-10-23

**WILLAMOWSKI, P.J.**

{¶1} Defendant-appellant David L. Deanda ("Deanda") brings this appeal from the judgment of the Court of Common Pleas of Seneca County finding him guilty of felonious assault and sentencing him to seven years in prison. For the reasons set forth below, the judgment is affirmed.

{¶2} On September 19, 2009, Deanda was involved in a fight with David B. Swartz ("Swartz"). During the fight, Deanda grabbed a knife and proceeded to stab Swartz multiple times in the neck and chest. When the police and emergency medical technicians arrived, Deanda was arrested and Swartz was taken to the community hospital. Swartz was eventually transported by life flight to a trauma hospital due to his injuries.

{¶3} On September 23, 2009, the Seneca County Grand Jury indicted Deanda on one count of attempted murder, a felony of the first degree, in violation of R.C. 2923.02 and 2903.02(A). Doc. 1. A jury trial was held from May 17, to May 21, 2010. Doc. 71. The first relevant witness[1] for the State was Jacob DeMonte ("DeMonte"), a police officer for the Tiffin Police Department. Tr. 140. DeMonte testified that he was the first officer to arrive at the scene. Tr. 142. When he arrived he observed a man, later identified as Swartz, and Jolene Haubert ("Haubert") standing at the end of a driveway. Tr. 142-43. DeMonte observed several lacerations on Swartz's back and that Swartz was bleeding from the

---

[1] There was no dispute as to who had stabbed Swartz and no questions regarding the DNA evidence. Thus, some of the testimony is not relevant to this appeal and will not be discussed.

-2-

wounds. Tr. 143. From speaking with them, DeMonte identified the perpetrator as Deanda and identified him in the courtroom as the defendant. Tr. 143-44. When DeMonte first spoke to Deanda, he noted that he appeared to be oddly calm. Tr. 144. DeMonte did not originally note any injuries to Deanda. Tr. 145. When Deanda heard Swartz and Haubert identify him as the perpetrator, he responded with "F*** yeah, I stabbed 'em." Tr. 145. DeMonte then placed Deanda in handcuffs. Tr. 145. DeMonte testified that once he had completely restrained Deanda in the handcuffs, Deanda turned toward Swartz and started yelling "I'll kill you honky!" and "I'm gonna get you. I'm gonna get you Swartz." Tr. 146. DeMonte testified that he had to physically restrain Deanda from going after Swartz again. Tr. 146.

{¶4} DeMonte testified that once Deanda was in the police car, he claimed that he had acted in self-defense after Swartz started hitting him with a stick. Tr. 148. Upon examination of Deanda's head, DeMonte observed a knot on Deanda's head. Tr. 148. According to DeMonte, Deanda kept switching from yelling threats at Swartz to claiming that he had acted in self-defense, but the police weren't going to listen because he was not white. Tr. 148-150. As DeMonte shut the door to the cruiser, Deanda started cursing at the officers and yelling more threats at Swartz. Tr. 150. At the time Deanda was taken to the Sheriff's Office, he was only charged with persistent disorderly conduct and resisting arrest for his actions at the scene. Tr. 150.

{¶5} After Deanda and Swartz were removed from the scene, DeMonte continued to investigate. Tr. 151. DeMonte testified that he saw Swartz's abandoned shirt at the end of the driveway and that it was covered in blood. Tr. 151. DeMonte followed Haubert back to the garage where the altercation was believed to have started. Tr. 152. In the garage area, there was a "big mess" from the fight and everything was knocked over. Tr. 152. When DeMonte left the garage, he saw a knife with a silver blade, a gold handle, and blood on it lying beside the driveway. Tr. 152. DeMonte then began to tape off the crime scene and noticed a dowel rod lying by the sidewalk. Tr. 153.

{¶6} On cross-examination, DeMonte testified that there were children at the scene when the fight started. Tr. 156. DeMonte admitted that he did not question the children about who started the fight. Tr. 156. Deanda had indicated to DeMonte that Swartz had struck him multiple times with a stick, including hitting him in the head. Tr. 157-58. There was some indication that Deanda had suffered injury from being struck. Tr. 158. DeMonte testified that if someone were to strike another with the dowel rod he found, it would be painful and would cause injury. Tr. 159.

{¶7} The second witness presented by the State was Sergeant Mark Marquis ("Marquis") from the Tiffin Police Department. Tr. 161. Marquis testified that he responded to the report of the stabbing just prior to 9:00 p.m. on September 19, 2009. Tr. 163. When he arrived, he observed a man and woman

standing in the driveway holding some cloth against the man's back covering wounds. Tr. 163-64. Marquis also observed DeMonte holding a male up against the front of the house. Tr. 163. Marquis went to the couple and observed what appeared to be puncture wounds in the back of the man, later identified as Swartz. Tr. 164. When Marquis arrived, Deanda was in a highly irate state and did not appear to be injured. Tr. 165. Due to Deanda's emotional state, Marquis and DeMonte placed him in a patrol car to separate Deanda from Swartz. Tr. 166. The entire time the officers were trying to place Deanda in the car, he was trying to physically move towards Swartz and yelling comments at Swartz. Tr. 166. While another officer was driving Deanda away, he continued to yell at Swartz and yelled "I'll f*****g kill you." Tr. 168.

{¶8} Once Deanda was removed from the scene, Marquis began to secure the scene, identify witnesses, and procure statements from the witnesses. Tr. 168. Marquis observed the dowel rod lying in the driveway and also observed a knife with a four inch blade lying in the driveway as well. Tr. 169. Based upon the complexity of the matter and the amount of evidence to be gathered, Marquis called for the detectives to come investigate. Tr. 170. On cross-examination, Marquis testified that he did not take any witness statements at the scene. Tr. 171. Marquis testified that Deanda had claimed to have acted in self-defense. Tr. 172.

{¶9} The next witness for the state was Officer LaVerne Keefe ("Keefe"), who worked as a patrolman with the Tiffin Police Department. Tr. 173. Keefe

testified that when he arrived at the scene, he observed Haubert and Swartz at the end of the drive with Haubert pressing a shirt against Swartz's back to stop bleeding. Tr. 175. DeMonte had Deanda held against the side of the house. Tr. 175. Deanda was "highly agitated" and was yelling at Swartz. Tr. 177-78. Keefe's involvement was to guard the scene until the detectives arrived. Tr. 179. Keefe then assisted the detectives with the processing of the scene. Tr. 180.

{¶10} Toni Haubert ("Toni"), the sister of Haubert, was the next witness to testify for the State. Toni testified that she lives with Haubert at the home where the incident occurred. Tr. 181. Toni testified that they were having a garage sale and she heard arguing in the garage. Tr. 184. Eventually, she observed Deanda with the knife and she saw him jab it towards Swartz a couple of times. Tr. 185. Toni then left the garage and went to call the police. Tr. 185. The next thing Toni observed was Swartz receiving medical treatment from the paramedics, but she was watching from the neighbor's porch. Tr. 187.

{¶11} On cross-examination, Toni testified that Swartz had been living with them, but was supposed to have moved out the night before. Tr. 189. The day of the fight, Swartz had packed up his stuff to move and Toni had told him to leave because nobody wanted him there. Tr. 191. Toni testified that at the time of the altercation, her 10 year old daughter and Deanda's eleven year old nephew were present. Tr. 193. The day after this incident, Swartz was back at the house and had spent less than 12 hours in the hospital. Tr. 198. Upon Swartz's return

from the hospital, he was not acting differently. Tr. 199. His injuries did not appear to affect how he was living his life. Tr. 201. Swartz sat around watching television just like he usually did. Tr. 201.

{¶12} The fifth witness for the State was Haubert, the girlfriend of Swartz. Tr. 204-205. Haubert testified that the children were playing in the backyard. Tr. 210. Haubert testified that Deanda came into the garage, nudged Swartz, and said he "was gonna 'f**k him up' and Swartz had replied back, 'No, you're not. You need to leave.'" Tr. 210. Haubert then testified that Deanda had a club in his left hand and he brought it around. Tr. 210-11. She then testified that she left to take the children inside and she did not see the fight. Tr. 211. When she came back out of the house, she heard Deanda say "I'm stabbing you. I'm gonna kill you." Tr. 212. At that time, she called the police. Tr. 212. As far as she knew, Deanda struck the first blow in the altercation. Tr. 213. While Swartz was walking away from Deanda, she heard Deanda repeatedly saying "I'm gonna kill you." Tr. 213. Later, Haubert was able to observe the knife and identified it as belonging to Deanda. Tr. 214.

{¶13} As to the injuries, Haubert testified that she observed a gash in Swartz's neck and multiple stab wounds to Swartz's back. Tr. 215. She then began to put pressure on the injuries to try and stem the blood flow. Tr. 215. She used Swartz's shirt to apply the pressure to the wound. Tr. 215. Haubert testified that Swartz had suffered seven stab wounds. Haubert testified that the ambulance

took Swartz from the scene and that she received a call that he was being flown to Toledo for emergency care.  Tr. 218.  According to Haubert, Swartz was released the next day and was in a very weak condition, barely able to move.  Tr. 218.  At the time of the hearing, Swartz still has scars from his injuries.  Tr. 219.

{¶14} On cross-examination, Haubert testified that she had previously dated Deanda and started dating Swartz after her relationship with Deanda ended.  Tr. 220.  Haubert admitted that the day of the fight she was trying to end the relationship with Swartz.  Tr. 223.  The night before the incident, Swartz was supposed to move out of the house, but was unable to do so because he was incarcerated and his vehicle was impounded.  Tr. 224.  Haubert also admitted that Swartz did not like Deanda because Deanda was one of her "exes" and Swartz "didn't like my exes."  Tr. 225.  According to Haubert, Swartz was a jealous boyfriend.  Tr. 225.  The breakup before the incident ended because when Swartz was stabbed, Haubert felt bad for him and wanted to take care of him.  Tr. 226. Haubert testified that she felt like the incident was her fault because Swartz "told me it was my fault because [Deanda] [was] my ex."  Tr. 226.  Haubert admitted that Swartz has made rude comments about Deanda.  Tr. 227.  Haubert also restated that she did not see the actual fight and did not see any part of the physical altercation.  Tr. 228.  Haubert testified that Swartz would get angry every time Deanda's name was mentioned.  Tr. 230.

{¶15} Swartz was the sixth witness for the State. Swartz testified that earlier in the day in question Deanda had threatened him with a stick while he was standing on the sidewalk. Tr. 237. Later that night, Swartz was in the garage talking to Haubert when Deanda entered the garage. Tr. 238-39. According to Swartz, Deanda came up to him saying something and Swartz told Deanda to leave. Tr. 239. Deanda then initiated the contact by hitting Swartz with a club he had been holding behind his back. Tr. 239. Swartz testified that Deanda said something to him, but he did not recall what was said. Tr. 239. Swartz testified that Deanda had struck him multiple times all over his body. Tr. 240. Swartz testified that he was able to get the stick away from Deanda and then Deanda began stabbing him. Tr. 241. At that time, Swartz did not know what Deanda was doing until Deanda told him he was cutting him. Tr. 241. Swartz then pulled Deanda's hoodie over Deanda's head and began striking Deanda's head with the stick. Tr. 242. According to Swartz, this did not happen until after Deanda had stabbed him. Tr. 242. Swartz testified that he was stabbed seven times and he was in pain. Tr. 243. He did not notice any blood on himself until Deanda told Swartz that he was being stabbed. Tr. 243. Swartz believed that Deanda was trying to kill him because Deanda "kept stabbing me." Tr. 244. Swartz testified that Deanda delivered the first blow. Tr. 245. Deanda stopped approaching him with the knife when the police arrived. Tr. 247.

{¶16} After leaving the garage, Swartz walked out to the sidewalk and Haubert started putting pressure on his wounds to stop the blood. Tr. 247. Swartz testified that he was feeling shaky and the paramedics provided medical treatment for him. Tr. 247-48. The paramedics then transported him to Tiffin Hospital. Tr. 248. From there, Swartz was flown to St. Vincent's Hospital in Toledo by life flight because they thought he might be bleeding internally. Tr. 248. At St. Vincent's he was given intravenous treatments, the wounds were cleaned and closed, and he was watched to make sure there was no internal bleeding. Tr. 249. Swartz then identified State's Exhibits 65 and 66 as photographs of the t-shirt he was wearing when he was stabbed by Deanda. Tr. 250-51. State's Exhibits 67 through 74 were identified by Swartz as photographs of the injuries received due to the fight. Tr. 251-53.

{¶17} On cross-examination, Swartz denied that he had threatened the children with a baseball bat. Tr. 253-54. Swartz also denied that he was the initial aggressor in the fight. Tr. 254. Swartz admitted that he did hit Deanda in the head with the dowel rod. Tr. 255. Swartz also admitted that he was not happy that Deanda had previously dated Haubert. Tr. 255. Swartz denied that he and Haubert had broken up, but admitted that he had packed his things, placed them in his vehicle and was intending to leave because they were going to end the relationship. Tr. 259. However, Swartz stated that they never really broke up

because when he left, he was arrested for driving while intoxicated, his car was impounded, and he spent the night in jail. Tr. 259.

{¶18} Mark Wagner ("Wagner") testified that he was employed by Tiffin as an emergency medical technician ("EMT"). Tr. 351. On September 19, 2009, Wagner was sent to the scene of the incident at approximately 8:50 p.m. Tr. 353. When he arrived at the scene, he was told the victim was in the driveway and he observed Swartz standing there with towels on his neck and back. Tr. 354. Wagner testified that Swartz had injuries to his neck, his shoulder, and five injuries to his back. Tr. 355. Wagner was concerned that a lung had been punctured, so he was transported to the hospital. Tr. 355. When Deanda was removed from the scene, he was very agitated. Tr. 357. As Deanda was transported from the scene, he was yelling "I'm going to kill you" at the victim from the back of the police cruiser. Tr. 357.

{¶19} The next witness for the State was William Lalone ("Lalone"), who was employed by the City of Tiffin as an EMT. Tr. 361. Lalone, like Wagner, was dispatched to the scene the night of the incident to treat Swartz's injuries. Tr. 364. Lalone testified that Swartz had a stab wound to the left shoulder and two on his back which required attention. Tr. 364. There were additional wounds, but they did not require immediate attention as they were not bleeding. Tr. 364. Lalone testified that the injuries could have potentially been life threatening. Tr.

365. At the scene, no one alerted Lalone that Deanda needed any medical attention, so he was not treated. Tr. 368.

{¶20} The twelfth witness for the State was Detective Shawn Vallery ("Vallery") from the Tiffin Police Department. Tr. 373. Vallery assisted with the investigation of the incident. Tr. 374. After speaking with the officer at the scene, Vallery attempted to make contact with Swartz at Tiffin Mercy Hospital, but learned that Swartz had been transported to St. Vincent's Mercy Medical Center in Toledo. Tr. 375-76. Vallery spoke with the emergency room doctor, who told him that Swartz had suffered seven stab wounds: one to his face, one to his neck, three in the back, one to the side, and one in the shoulder. Tr. 376. Vallery then called St. Vincent's and spoke with a forensic nurse. Tr. 377. The nurse told him that wounds were not serious and that no vital organs had been hit. Tr. 377.

{¶21} After collecting the evidence, Vallery went to the jail to interview Deanda. Tr. 397. Vallery testified that he and Lieutenant Michelle Craig ("Craig") asked Deanda to show them his injuries. Tr. 398. They photographed the injuries. Tr. 398. Vallery testified that he observed a small abrasion on Deanda's forehead and a couple of small scratches on Deanda's neck. Tr. 398. On cross-examination Vallery testified that he interviewed Deanda at around midnight the night of the incident. Tr. 414. Vallery admitted that although he observed some injuries on Deanda, he was not the officer completing the exam and he did not observe the top of Deanda's head. Tr. 415. Deanda had told him

that he had "some bumps on his head." Tr. 416. To Vallery's knowledge, there was no medical examination done on Deanda to determine the severity of his injuries. Tr. 418.

{¶22} The next witness for the State was Megan Wise ("Wise"), a registered nurse at Mercy Hospital of Tiffin. Tr. 420. Wise testified that she assisted in the treatment of Swartz when he arrived at the emergency room on September 19, 2009. Tr. 422. Wise testified that as follows.

> **Swartz was alert, oriented. He was able to give us an account of what had happened. He had multiple stab wounds to his back, his shoulder and his neck.**

Tr. 422-23. Due to the location of the injuries and the potential for serious injury, Swartz needed to be seen by a more thorough trauma center. Tr. 423-24. According to Wise, Swartz was transported to St. Vincent's in Toledo because that facility is a level one trauma center. Tr. 433.

{¶23} Dr. William Sternfeld ("Sternfeld") was the fourteenth witness for the State. Tr. 438. Sternfeld testified that he is a general surgeon who provides trauma services for St. Vincent's. Tr. 439. On September 19, 2009, Sternfeld was the treating physician for Swartz. Tr. 443. Sternfeld testified that he was informed that Swartz had "suffered multiple stab wounds to his chest, face and neck and this occurred less than two hours earlier." Tr. 446. Upon examination, Sternfeld determined that there was no immediate danger to Swartz's airway, breathing ability, or circulation. Tr. 447. Sternfeld was concerned that the knife

had penetrated the muscle in the neck and caused major injury, but that had not occurred. Tr. 447. Sternfeld's second immediate concern was that a lung was punctured, but x-rays showed no evidence of a collapse. Tr. 448. The other stab wounds did not raise immediate concerns. Tr. 448. Sternfeld's diagnosis of Swartz was that "he had suffered multiple stab wounds, uhm, to the left side of his face, the left neck, the left flank in the back; that these were superficial wounds in his case and fortunately, in his case, not life threatening." Tr. 450-51. This diagnosis was not immediately known, but only determined after complete examination and further testing. Tr. 451. As a result of the injuries, Swartz suffered pain and may have permanent scars. Tr. 451-52. All of the injuries, except the one on the face were closed with staples. Tr. 452. The injury to the face was left alone because it was "very superficial, it was almost like a scratch." Tr. 452. Sternfeld testified that upon arrival, the belief was that there was a potential for death, but after evaluation, the risk of death was determined to be minimal. Tr. 453. Swartz was released from the hospital the next day since his injuries were considered to be minor. Tr. 454-55.

{¶24} The final witness presented in the State's case-in-chief was Craig. Craig testified that she is the officer in charge of the Investigative Unit of the Tiffin Police Department, Criminal Division. Tr. 464. Craig testified that when she received the call concerning the stabbing, she responded to the scene. Tr. 466. After getting a basic overview of the situation, Craig returned to the station to

prepare an affidavit for a search warrant. Tr. 468. When Craig processed the scene, she observed signs of a struggle and various spots with blood. Tr. 470. Craig testified that the knife was located approximately three-fourths of the way up the sidewalk behind a desk. Tr. 470.

{¶25} In addition to processing the scene for evidence, Craig also spoke to various witnesses. Craig testified that she spoke to Swartz on the phone while he was at St. Vincent's. Tr. 476. When Craig asked Swartz who had stabbed him, Swartz identified Deanda as the perpetrator. Tr. 477. Craig also learned that Toni and Haubert had witnessed portions of the incident and that possibly some of the children had. Tr. 477. Craig testified that she was told the children were in the garage playing when the argument started. Tr. 477.

{¶26} Back at the station, Craig interviewed Deanda and examined him for injuries. Tr. 493. Craig testified that she saw minor abrasions and scratches on Deanda and also saw a lump on his head. Tr. 494. There was no bleeding, though there might have been a small cut on Deanda's hand. Tr. 494. When Deanda was booked into the jail, when questioned about whether he was injured, he said no. Tr. 507. Thus, no medical examination was completed. Tr. 507. Craig proceeded to interview Deanda and recorded the interview. Tr. 552. The interview was played for the jury. Tr. 553.

{¶27} During the interview Deanda stated that Haubert left him for Swartz, came back to him, then left him again for Swartz. Tr. 558. The night before the

incident, Deanda heard Haubert and Swartz fighting because he was drunk. Tr. 558. Swartz then went to his car, started it and played music before reving the engine. Tr. 558. This occurred around four in the morning. Tr. 558. The next day, Haubert told Deanda that she was done with Swartz and wanted him out of the home. Tr. 559. Swartz then came back to the home around three or four and Toni told Deanda to lock the door to keep Swartz out. Tr. 560. Toni was yelling at Swartz to go away. Tr. 561. Deanda told Craig that Swartz had then gone to the neighbor's porch and started calling Deanda derogatory names. Tr. 563. Haubert was not there because she had left when she received word that Swartz was coming. Tr. 564. She then came home and she started talking to Swartz. Tr. 565-67. Later Toni and Deanda walked into the garage, and Swartz kept calling Deanda names. Tr. 567. The situation escalated and Swartz eventually picked up the dowel rod that was sitting there and struck Deanda with it. Tr. 568. Deanda stated that Swartz had struck him several times with the stick, so he threw him to the ground. Tr. 571. Swartz got up and started hitting him again, so he grabbed the knife and removed it from its case. Tr. 573. Swartz kept hitting him, so he stabbed him a couple of times with the knife. Tr. 574. Deanda denied that he wanted to kill Swartz. Tr. 576. Deanda denied remembering making the comments and stated that he was taking medicine to calm himself down. Tr. 578. Deanda admitted that he had not taken his antipsychotic medicine in two or three days. Tr. 585. Deanda also admitted that he frequently took the wrong dosage of

-16-

the pills. Tr. 586. Craig testified that during the interview, Deanda had very little reaction when informed of Swartz's condition. Tr. 603. Deanda identified the knife and the jacket as belonging to him. Tr. 603-64.

{¶28} After the State rested its case, Deanda presented his defense. His first witness was Harley Makeever ("Makeever"). Makeever was the 10 year old daughter of Toni. Tr. 631. Just prior to the fight starting, Makeever was in the garage talking to Toni. Tr. 634. Makeever testified there were three other children in the area. Tr. 634. Just before the fight, Swartz was swinging a baseball bat at the children. Tr. 634. Makeever estimated that the bat came within a foot of hitting them and it scared her. Tr. 635. On cross-examination Makeever testified that she does not like Swartz and does not want him to live in their home. Tr. 636.

{¶29} Deanda's second witness was Joey Deanda ("Joey"), who was the twelve year old nephew of the defendant. Tr. 637, 639. Joey testified that before the fight, he, Makeever, and the other children were in the garage. Tr. 640. In addition, Toni and his grandmother were in the garage. Tr. 641. Swartz was walking toward the neighbors and calling Deanda "a Spic". Tr. 641. Later Swartz pulled a bat away from one of the children and swung it at them. Tr. 642. The bat came close to him and scared him. Tr. 643. Swartz then threw the bat into the backyard. Tr. 643. When the fight started, Joey was in the garage and saw the fight. Tr. 643. Joey testified that Swartz punched Deanda first, then Swartz

grabbed a stick and started hitting Deanda. Tr. 644. Joey testified that he left when Deanda grabbed the knife. Tr. 645. On cross-examination, Joey admitted that he loved his uncle, but did not like Swartz. Tr. 647. Joey also admitted that he saw Deanda stab Swartz one time. Tr. 648.

{¶30} Deanda then recalled Toni to the stand to testify on his behalf. Tr. 648. Toni testified that although she lives with Swartz, she only talks to him on his good days. Tr. 650. Toni testified that based upon her experiences with Swartz, he is not truthful. Tr. 654. On cross-examination, Toni admitted that she sometimes does not like Swartz because he is sometimes disrespectful and mistreats people. Tr. 654-55.

{¶31} Deanda's fourth witness was Vicky Deanda ("Vicky"), who was the defendant's sister. Tr. 656. Vicky testified that she observed Swartz around the house in the weeks following the fight.

{¶32} The final witness for the defense was Deanda. Deanda testified that he and Swartz did not interact prior to the fight. Tr. 663. The day of the fight Deanda had earlier confronted Swartz about calling him names, which Swartz denied. Tr. 665. Immediately before the fight, Deanda walked into the garage with Toni. Tr. 666. Toni and Haubert were facing away from him while they worked on a project. Tr. 666. Swartz then walked toward him and "got in my face." Tr. 667. The two exchanged words that "were not friendly words." Tr. 668. Deanda testified that he raised the stick, Swartz took it away from him and

started hitting him in the head with it. Tr. 668. Deanda testified that he was handing it to Swartz in a way and he did not understand why he did it. Tr. 669. According to Deanda, Swartz took the first swing. Tr. 670. Deanda claimed that he grabbed Swartz by the shirt and pushed him until he fell. Tr. 670. Deanda then reached down and pulled Swartz up by his collar. Tr. 671. Swartz then began hitting Deanda with the stick again. Tr. 671. According to Deanda, Swartz pulled Deanda's hoodie over his head and kept hitting him. Tr. 671. Deanda stated that he could only see white spots. Tr. 671. Deanda testified that he pulled Swartz closer to him to reduce the strength with which Swartz could strike him. Tr. 673. At the same time, Deanda was pulling the knife out of its sheath with his other hand. Tr. 673. Deanda then admitted to stabbing Swartz multiple times. Tr. 673. Deanda claimed that when he stabbed Swartz, Swartz was still hitting Deanda with the dowel rod. Tr. 674. Deanda claimed that the sole reason for stabbing Swartz was to get him to stop hitting Deanda and denied wanting to kill Swartz. Tr. 675. After stabbing Swartz, Swartz fell into the kiln and then got up and started hitting Deanda again. Tr. 675. Deanda again pushed Swartz down and Swartz picked up a chair and tossed it at Deanda. Tr. 676-77. After falling the second time, Swartz finally walked away from Deanda. Tr. 677. Deanda testified that both he and Swartz could have ended the confrontation at any time and left the garage as neither was blocking the other. Tr. 678. When Swartz did eventually leave, he was still holding the dowel rod. Tr. 679.

{¶33} After the fight, Swartz went up the driveway toward the road. Tr. 679. Deanda testified that he threw the knife to the side and went toward the house. Tr. 679-80. The police then arrived and told Deanda to put up his hands. Tr. 681. At that point in time, Deanda admitted that he was mad. Tr. 681. Deanda claimed that he told the officers he had head injuries and that he was only trying to defend himself, but the officer told him to "shut up, go to the cruiser." Tr. 681. Deanda denied trying to go after Swartz. Tr. 688. Deanda also testified that he did not recall threatening Swartz, but does remember being loud. Tr. 688.

{¶34} Deanda testified that while at the jail, he told them that his head was bruised and that he had severe headaches. Tr. 690. After two or three weeks, a doctor saw him. Tr. 690. After another two or three months, he was taken to the hospital for head x-rays. Tr. 690. After the fight, there were lumps, bruises, and an indented spot on his head. Tr. 691. The doctor ordered the x-ray due to the indentation.

{¶35} Deanda testified that he was nervous about Swartz because he had earlier seen Swartz swing the bat at the children. Tr. 693. He claimed that he stabbed Swartz because he felt that he had no other option to prevent himself from being harmed. Tr. 693. Deanda denied that he intended to start a fight with Swartz or that he was jealous of Swartz. Tr. 693-94. Deanda testified that his past experience with violent situations affected how he reacted to Swartz on the day of

the incident. Tr. 695. Based upon his experience, Deanda took Swartz's behavior as an indication that he wanted to fight Deanda. Tr. 696.

{¶36} On cross-examination, Deanda again admitted that he had the stick first and had handed it to Swartz. Tr. 699. Deanda also admitted that he could have left the garage the first time he knocked Swartz down, but instead chose to help Swartz up. Tr. 701. Deanda admitted that he had previously been in fights which resulted in permanent lumps on his head. Tr. 703. When questioned about the racist comments allegedly made by Swartz, Deanda admitted that they upset him. Tr. 704. At the conclusion of his testimony, Deanda rested his case.

{¶37} The State then called Craig on rebuttal. Tr. 714. Craig testified that the booking sheet indicated that Deanda had not requested medical treatment. Tr. 716. When she examined Deanda, he did not show signs of pain or discomfort and did not request medical treatment. Tr. 717. At the conclusion of the trial, the jury returned a guilty verdict of the lesser included offense of felonious assault, a felony of the second degree. *Id.* A sentencing hearing was held on May 21, 2010. Doc. 72. The trial court sentenced Deanda to serve seven years in prison. *Id.* On June 8, 2010, Deanda filed his notice of appeal. Doc. 74. Deanda raises the following assignments of error on appeal.

### First Assignment of Error

**The trial court erred to the prejudice of [Deanda] by permitting the State of Ohio to introduce various instances of inadmissible hearsay testimony over the objection of the defense in violation**

**of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and Article I, Section 10 of the Ohio Constitution.**

### Second Assignment of Error

**The trial court erred to the prejudice of [Deanda] by denying the proffered testimony of Joey Deanda and Vicki Deanda into evidence.**

### Third Assignment of Error

**[Deanda's] conviction should be overturned because certain statements made during the Prosecution's rebuttal argument at closing amount to prosecutorial misconduct.**

### Fourth Assignment of Error

**[Deanda's] conviction should be overturned because the trial court's instruction of felonious assault as a lesser included offense of attempted murder is erroneous and thus the trial court committed plain error.**

### Fifth Assignment of Error

**[Deanda's] conviction was against the manifest weight of the evidence.**

This court heard the appeal and on February 6, 2012, issued an opinion reversing the judgment of the trial court based upon the fourth assignment of error. *State v. Deanda*, 3d Dist. Seneca No. 13-10-23, 2012-Ohio-408. The State then appealed to the Ohio Supreme Court. On May 1, 2013, the Ohio Supreme Court reversed this court's prior opinion. *State v. Deanda,* 136 Ohio St.3d 18, 2013-Ohio-1722, 989 N.E.2d 986. The case is now before us on remand.

**{¶38}** In the first assignment, Deanda claims that the trial court erred by allowing the State to introduce hearsay testimony over objection. Hearsay is defined as "a statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C).

> **Hearsay is not admissible except as otherwise provided by the Constitution of the United States, by the Constitution of the State of Ohio, by statute enacted by the General Assembly not in conflict with a rule of the Supreme Court of Ohio, by these rules, or by other rules prescribed by the Supreme Court of Ohio.**

Evid.R. 802. "Ordinarily, a trial court is vested with broad discretion in determining the admissibility of evidence in any particular case, so long as such discretion is exercised in line with the rules of procedure and evidence." *Rigby v. Lake Cty.*, 58 Ohio St. 3d 269, 271, 569 N.E.2d 1056 (1991). An appellate court's review of the admission of evidence is limited to a determination as to whether the trial court abused its discretion. *Id.* "An abuse of discretion connotes more than a mere error in judgment, it implies that the trial court's decision was arbitrary, unreasonable, or unconscionable." *State v. Gutierrez*, 3d Dist. Hancock No. 5-10-14, 2011-Ohio-3126, ¶ 22.

**{¶39}** In support of his argument, Deanda lists three instances of alleged admission of hearsay statements. The first statement was when the State asked Keefe how he had determined that Deanda was involved in this matter. Keefe testified that Swartz and another person had identified Deanda as the perpetrator.

Deanda argues that this testimony was offered to bolster the credibility of the witnesses and offered for the truth of the matter. The testimony offered was this.

> **Q.   Okay.  And were you able to determine the involvement of Deanda in this incident?**
>
> **A.   Yes.**
>
> **Q.   And what was that?**
>
> **A.   I asked, uhm, [Swartz] and [Haubert], uhm, who had done this to [Swartz].**
>
> **Mr. Kahler:  I'm gonna object, Your Honor.**
>
> **The Court:  Overruled.**
>
> **Mr. Kahler:  Hearsay.**
>
> **The Court:  There is an exception to the hearsay.  Overruled.**
>
> **The Witness:  Uhm, they stated that it was the subject that was now being escorted away, uhm, by the other officers that were on the scene.  I asked who that was and they stated that it was [Deanda].**

Tr. 176-77.  This testimony is a statement by a third party made outside of trial and not under oath.  Thus, it qualifies as a hearsay statement.  It also does not appear to meet the requirements of one of the exceptions to the hearsay rule in that it was not an excited utterance nor was it a present sense impression, but was a response made to an officer after the situation was over.  However, in order for this to be reversible error, it must have some element of prejudice.  *See State v. Betts*, 4th Dist. Pickaway No. 02CA26, 2004-Ohio-818, ¶ 32 and *State v.*

*Sutorious*, 122 Ohio App.3d 1, 701 N.E.2d 1 (1st Dist. 1997). Hearsay statements admitted that are repetitious of admissible statements and are supported by overwhelming evidence are not prejudicial. *State v. Self*, 56 Ohio St.3d 73, 82, 564 N.E.2d 446 (1990)

{¶40} Deanda claims this testimony was prejudicial because it buttressed the testimony of Swartz and Haubert who both testified at trial later. However, Keefe did not testify as to the veracity of the statements, just that they were made. Both Swartz and Haubert testified and Deanda had the opportunity to challenge the statements made to Keefe. The admissible testimony provided by many of the witnesses, including Deanda himself, identified Deanda as the person who had stabbed Swartz. This fact was not disputed during the trial. Additionally, the State argues in its brief that the statement was merely to show how the investigation occurred and was not offered for the truth of the matter. This argument may be a valid reason for allowing the testimony, though not the one provided by the trial court. Given all of this, the trial court did not err in allowing Keefe to testify to what Haubert and Swartz stated at the scene.

{¶41} The second instance challenged by Deanda as hearsay evidence was testimony by Vallery as to what an unidentified nurse stated in response to

questions concerning the victim.[2]  Specifically, the following testimony was given

at trial.

> **The Witness:  I asked if the doctor who treated him was – would be able to speak with me if I came out.  They advised that she would be able to do that.  I responded out to the emergency room, uhm, spoke with a Dr. Coleman.  I inquired of her about the injuries to Mr. Swartz and any other information she could give me.  Uhm, she informed me that –**
>
> **Mr. Kahler:  Objection hearsay.**
>
> **The Court:  Overruled.**
>
> **The Witness:  She informed me that the victim, [Swartz], had seven stab wounds to his person; one being in the face, one being in the neck, three in the back, one in the side and one in the shoulder.**
>
> **Ms. Best:   Did you continue to follow-up on Mr. Swartz's condition after that?**
>
> **A.    Yeah.  I asked her about the injuries and whether they were life threatening.  She advised they had the potential –**
>
> **Mr. Kahler:  Objection.**
>
> **The Court:  Sustained.**
>
> **The Witness:  I – After Mercy Hospital, uhm, I left that location. I asked dispatch to get St. Vincent's Medical Center information so I could contact them to learn about his condition.**
>
> **Ms. Best:  Okay.  Were you able to make contact with anyone at St. Vincent's Mercy Medical Center?**

---

[2] Deanda could also have challenged the testimony concerning Dr. Coleman as well, since she was not called to testify as a witness, but her statements were admitted over objection.

**A. Yeah. I spoke with a forensic nurse there. Uhm, I identified myself to her and informed her I was in contact for David Swartz. Uhm, she informed me that –**

**Mr. Kahler: Objection hearsay.**

**The Court: I'm gonna allow this, but we're having a lot – we're having some information as background, but the Court's not gonna allow too much, only for background purposes. Overruled.**

**The Witness: She informed me that he didn't he was – he was okay and that his injuries didn't hit any vital organs. \* \* \***

Tr. 376-77. Neither the doctor nor the forensic nurse mentioned in the above statements testified at the trial. The State argues that these statements were not offered for the truth of the matter, and merely to show how the investigation proceeded. This court notes that Vallery could have shown the process very easily without resorting to stating what exactly he was told by third parties. The testimony concerning the doctor telling Vallery the number of wounds and the specific locations of the wounds was more than was necessary to explain why Vallery took the action he did and were hearsay statements. Likewise, the statements by the unidentified forensic nurse as to the condition of the victim were not necessary to show why actions were taken. The same result could have been reached by Vallery merely stating that he spoke to the nurse who gave him an update on the victim's condition. There was no need for Vallery to testify as to exactly what was said by a third party and no hearsay exception applies. Thus, these statements were hearsay statements.

-27-

{¶42} As discussed above, to have reversible error for the admission of a hearsay statement, there must be some prejudice shown. The number of stab wounds and the condition of Swartz was evidence that was provided by Swartz, Wise and Sternfeld when they testified. Thus the statements were repetitious. The facts offered by the statements that Swartz was stabbed multiple times, that he suffered no serious injury as a result of being stabbed, regardless of what could have happened, was supported by overwhelming evidence. Without a showing of prejudice, the admission of the hearsay statements in this instance was harmless.

{¶43} The third instance of hearsay raised by Deanda was when Craig testified as to statements made by Swartz.

**A.   I talked to [Toni] and [Haubert] and to [Swartz].**

**Q.   How did you talk to [Swartz]?**

**A.   I was collecting the things and they said, "David is on the phone". And I said, "David Swartz?"  And they said, "yes".  And I asked to talk to him.  He was calling from St. V's and he was saying that they're gonna keep him.**

**Mr. Kahler:  Objection, hearsay.**

**The Court:  Overruled.**

**The Witness:  He told me that they were keeping him overnight.**

**Mr. Kahler:  Objection, hearsay.**

**The Court:  Overruled.**

**The Witness:  And, uhm, he had staples.  And, uhm, I told (sic) him, "who did this to you?" and he said –**

> **Mr. Kahler:  Objection hearsay.**
>
> **The Court:  Overruled.**
>
> **The Witness:  "David, the guy from upstairs."  I told him I needed him to come in and give me a statement.  If he was not released I would be coming up there within the next day or two.**

Tr. 476-77.  These statements were not made by a witness who was unavailable, were not present sense impressions, and were not excited utterances.  The statements to which Craig testified were statements made by Swartz who testified.  These statements were also not necessary to show how the investigation proceeded.  However, these statements were made by a witness who testified at trial and were thus subject to cross-examination.  Additionally, the statement of identity, as discussed above, was supported by overwhelming evidence including Deanda's own admission.  The statement concerning the overnight stay was admitted not only through Swartz's testimony, but through the testimony of Sternfeld.  The statements were thus not prejudicial.  Having found no prejudice in the admission of the hearsay statements, the first assignment of error is overruled.

{¶44} In the second assignment of error, Deanda alleges that the trial court erred by excluding the proffered testimony of Joey and Vicky.[3]  Joey was going to testify that he overheard Haubert telling Swartz a week after the fight that she was responsible for causing the fight because she had set it up so that Swartz and

---

[3] No explanation for the exclusion of the evidence was placed upon the record.  While there may have been pretrial discussion or discussion off the record, this court lacks the ability to review that information, so must merely address the exclusion of the evidence without explanation.

Deanda would fight. The denial of this testimony is not error because it is not relevant to the issues before the jury. Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. Evidence that is not relevant is not admissible. Evid.R. 402. There was no question of fact before the jury regarding whether the fight occurred or even whether Deanda had stabbed Swartz. That was undisputed. The issues for the jury were really four questions: 1) Were Deanda's actions taken in self-defense?;[4] 2) Did Deanda intend to kill Swartz?;[5] 3) How serious were Swartz's injuries?;[6] and 4) Was Deanda acting under the influence of serious provocation?[7] These four questions would determine what offense, if any, Deanda should be convicted of. The fact that Haubert may have tried to instigate the fight between the two adult men does not change the issues before the jury.[8] Thus, the evidence did not address a fact of consequence and the trial court did not err in excluding it.

{¶45} Deanda also challenges the denial of the testimony of Vicky. Vicky was going to testify that in the week after the fight, she observed Swartz behaving

---

[4] This would help determine whether Deanda was guilty of any offense.
[5] This would help determine whether Deanda was guilty of attempted murder by attempting to purposely kill someone.
[6] This would distinguish between the offenses of felonious assault which requires the causing of serious physical harm versus mere physical harm that would result in a simple assault charge.
[7] This would distinguish felonious assault from aggravated assault.
[8] The fact that a third party wants two adults to engage in physical combat does not negate the responsibility of the two adults for their own actions.

like he normally would and showing no indication of pain or disability. This evidence arguably could address the question of the seriousness of Swartz's injuries and thus may have been relevant. "The admission or exclusion of relevant evidence is within the sound discretion of the trial court." *State v. Skatzes*, 104 Ohio St.3d 195, 2004-Ohio-6391, ¶ 107, 819 N.E.2d 215. Similar testimony to what Vicky was offering was admitted through the testimony of Toni. Additionally, Sternfeld testified that Swartz's injuries were medically considered to be minor. Tr. 454-55. Thus the same testimony that was excluded was admitted through other channels. The trial court did not act arbitrarily, unconscionably, or unreasonably in not allowing the testimony. Even if the trial court had acted unreasonably, the testimony would have been redundant, so there was no prejudice. The second assignment of error is overruled.

{¶46} In the third assignment of error, Deanda challenges statements made during the rebuttal argument, alleging that the prosecutor engaged in misconduct. "The test for prosecutorial misconduct is whether the remarks were improper, and, if so, whether the remarks prejudicially affected the accused's substantial rights." *State v. Twyford*, 94 Ohio St.3d 340, 354-55, 2002-Ohio-894, 763 N.E.2d 122. The focus of this test "is the fairness of the trial, not the culpability of the prosecutor." *Id*. (quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 947, 71 L.Ed.2d 78, 87 (1982)).

{¶**47**} Here, Deanda claims that the following statements made during closing argument and during the rebuttal closing argument were improper because the prosecutor injected her personal opinion. This argument is based upon the following statements of the prosecutor.

> **You also heard from the officers that the defendant continued to fight with them as he was being placed into custody. And that as he was being placed into custody he continued to come after David Swartz over and over and over again. He was pulling officers along with him yelling "I'm gonna kill you". But he wasn't trying to kill him, was he?**
>
> **Maybe we should take the defendant at what he says. "I'm gonna kill you". Seems pretty clear to me.**
>
> **He kept coming after the victim until the officers were finally able to put him in the cruiser, all the while yelling at David Swartz, "I'll kill you, honky." And I'm not gonna use the word, "I'll f'ing kill you" again. Maybe we just misinterpreted that, right? I don't think so.**
>
> **\* \* \***
>
> **But the worse of them all, on his neck. What could possibly be the purpose of stabbing somebody in the neck? Considering what the doctor told us, Dr. Sternfeld, and the nurse Megan Wise, it's a pretty serious place to stab somebody. Maybe like you'd wanna kill 'em? Pretty much, yeah, I'd have to say you stab somebody in the neck you're trying to kill 'em.**
>
> **The carotid artery is there, the jugular, platysma muscle. You heard Dr. Sternfeld tell you if the platysma muscle, it goes all the way across the neck. The defendant told you he wasn't a doctor. So how – I don't know how he wouldn't know he was gonna hit it. And then there was one on the face also. That one didn't require staples, but we had six others. Do you think maybe, just maybe? Nope.**

**There's no reasonable doubt present that the defendant was doing anything other than trying to kill the victim.**

**\* \* \***

**Clearly, the defendant doesn't like the victim, but it's all the other way around. We got that all wrong, right? I don't think so.**

**\* \* \***

**The defendant claims to not remember stabbing Mr. Swartz seven times. And also that, well, he didn't really remember yelling "I'm gonna kill you, honky" and that sort of thing. He didn't remember any of that because those are the parts that makes him very obviously guilty of the charge that he's been charged with; attempted murder.**

**But you're just supposed to believe that he's honest. Everything else says he's not, but you just should believe him because if he – if he says it, well then we just gotta take him for his word, right?**

Tr. 823-24, 826-27, 856-57. Deanda argues that these statements showing that the prosecutor did not believe his statements and allegedly injecting her personal opinion as to his credibility affected a substantial right. The record does not support this conclusion. All of these arguments were made in support of the charge of attempted murder. The prosecutor specifically tells the jury that these are the reasons why Deanda should be found guilty of attempted murder. All of the comments had to do with Deanda having a purposeful intent to kill Swartz. However, the jury found Deanda not guilty of attempted murder. Thus the statements were not prejudicial and did not affect a substantial right.

**{¶48}** Deanda also claims that the prosecutor committed misconduct by making misstatements of law. In support of this argument, Deanda cites to the misstatement by the prosecutor that Deanda could not claim self-defense because he claimed to have brought the stick and handed it to Swartz. The prosecutor argued that this evidence shows that Deanda did not act in self-defense because he instigated the fight by giving Swartz a weapon. Deanda correctly claims that the affirmative defense of self-defense may still be used even if one initially provokes the incident if proper steps to end the fight are taken. *See State v. Melchior*, 56 Ohio St.2d 15, 381 N.E.2d 195 (1978). However, a misstatement of law by the prosecutor is harmless error if the trial court correctly instructs the jury as to the law. *State v. Carter*, 72 Ohio St.3d 545, 1995-Ohio-104, 651 N.E.2d 965. Here, regardless of the statements of the prosecutor, the trial court instructed the jury on self-defense as follows.

> **To establish a claim of self-defense, the defendant must prove by the greater weight of the evidence, that he was not at fault in creating the situation giving rise to the injuries; and he had reasonable grounds to believe, and an honest belief, even if mistaken, that he was in immediate danger of death or great bodily harm; and, that his only reasonable means of retreat from such danger was by the use of deadly force; and he had not violate – violated any duty to retreat to avoid the danger.**
>
> **Now, the defendant has a duty to retreat if he was at fault in creating the situation giving rise to the injuries caused to David B. Swartz; and, did not have reasonable grounds to believe, and an honest belief that he was in danger of death or great bodily harm; and, that a reasonable means of escape from that danger other than by the use of deadly force.**

> **Now, the defendant no longer had a duty to retreat if he retreated from the situation, reasonably indicated his intention to retreat from the situation and no longer participate in it; and he then had reasonable grounds to believe and an honest belief that he was in immediate danger of death or great bodily harm; and the only reasonable means of escape from that danger was by the use of deadly force, even though he was mistaken as to the existence of that danger.**
>
> **Words alone do not justify the use of force. Resorting to such force is not justified by abusive language, verbal threats, or other words no matter how provocative.**
>
> **In deciding whether the defendant had reasonable grounds to believe, and an honest belief that he was in immediate danger of death or great bodily harm, you must put yourself in the position of the defendant with his circumstances, excuse me, with his characteristics, his knowledge, or lack of knowledge, and under the circumstances and conditions that surrounded him at the time. You must consider the conduct of David B. Swartz and decide whether his acts and words caused the defendant to reasonably and honestly believe he was about to be killed or receive great bodily harm.**
>
> **If the defendant used more force than is reasonably necessary, and if the force used is greatly disproportionate to the apparent danger, then the defense of self-defense is not available.**

Tr. 815-17. These instructions are a correct statement of the law and are taken from the Ohio Jury Instructions. O.J.I., §421 et seq. Since the trial court correctly instructed the jury as to self-defense, any misstatement of the law by the prosecutor is not prejudicial. The third assignment of error is overruled.

{¶49} In the fourth assignment of error, Deanda claims that the trial court erred by finding that felonious assault is a lesser included offense of attempted

-35-

murder. This court has previously ruled on this issue and it was appealed to the Supreme Court of Ohio. *See Deanda, supra*. The Supreme Court of Ohio found that under the facts of this case, the charge of felonious assault is a lesser included offense of attempted murder. *Id*. Based upon that decision, the fourth assignment of error is overruled.

{¶50} The final assignment of error alleges that the verdict is against the manifest weight of the evidence. Unlike sufficiency of the evidence, the question of manifest weight of the evidence does not view the evidence in a light most favorable to the prosecution.

> **Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief."**

*State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 514 (1997) (citing Black's Law Dictionary (6 Ed.1990) 1594). A new trial should be granted only in the exceptional case in which the evidence weighs heavily against conviction. Id. Although the appellate court acts as a thirteenth juror, it still must give due deference to the findings made by the jury.

> **The fact-finder, being the jury, occupies a superior position in determining credibility. The fact-finder can hear and see as well as observe the body language, evaluate voice inflections, observe**

> **hand gestures, perceive the interplay between the witness and the examiner, and watch the witness' reaction to exhibits and the like. Determining credibility from a sterile transcript is a Herculean endeavor. A reviewing court must, therefore, accord due deference to the credibility determinations made by the fact-finder.**

*State v. Thompson*, 127 Ohio App.3d 511, 529, 713 N.E.2d 456 (8th Dist. 1998).

**{¶51}** In order to obtain a conviction against Deanda for felonious assault, the State was required to prove that Deanda knowingly caused serious physical harm to Swartz. *See* R.C. 2903.11(A)(1). Serious physical harm is defined as any of the following.

> **(a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;**
>
> **(b) Any physical harm that carries a substantial risk of death;**
>
> **(c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;**
>
> **(d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;**
>
> **(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.**

R.C. 2901.01(A)(5). The evidence is undisputed that Deanda stabbed Swartz seven times. Multiple witnesses testified to this fact. Deanda admitted that he stabbed Swartz multiple times, though he was not sure of the number of times.

There is also no question that these injuries could have been life-threatening, though they turned out not to be. Deanda unquestionably stabbed Swartz in the neck and the back. The injury to the back bled substantially. The injuries looked serious enough to cause Swartz to be transferred via life flight to a trauma one center in Toledo. There was ample evidence provided that these injuries required treatment through the use of staples, that they would cause pain, and that they could leave permanent scars. The jury observed several pictures of the injuries and heard the medical testimony. There was some testimony that the pain may not have been severe or that the injuries were rather minor. However, the evidence is not such that this court would find it weighs heavily against conviction. Thus, the verdict is not against the manifest weight of the evidence. The fifth assignment of error is overruled.

{¶52} Having found no error prejudicial to Appellant, the judgment of the Court of Common Pleas of Seneca County is affirmed.

*Judgment Affirmed*

**ROGERS, J., concurs in Judgment Only.**

**SHAW, J., concurs.**

**/jlr**